IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **ANTHONY CARTER,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. **3:10-CV-1486-L** |
| | § | |
| **LUMINANT POWER SERVICES** | § | |
| **COMPANY,** | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the court is Defendant Luminant Power Services Company's Motion for Summary Judgment, filed August 15, 2011. After carefully considering the motion, response, reply, appendices, and applicable law, the court **grants in part** and **denies in part** Defendant Luminant Power Services Company's Motion for Summary Judgment.

### I.    Factual and Procedural Background

On July 30, 2010, Anthony Carter ("Carter" or "Plaintiff") filed his Original Complaint (the "Complaint") against Luminant Power Services Company ("Luminant" or "Defendant"). Carter, who is African-American, contends that Luminant violated 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2, *et. seq.*, by committing unlawful employment practices on the basis of his race. Plaintiff asserts claims of discrimination, retaliation, and harassment. Luminant contends that it did not discriminate against Carter because of his race or retaliate against Carter because of his opposition to any alleged unlawful employment practice. Luminant further contends that the objectionable conduct alleged by Carter was not race-based and that it did not maintain a racially hostile work environment.

### A.  Plaintiff's Employment with Luminant

Defendant Luminant Power Services Company ("Defendant" or "Luminant") hired Plaintiff in December 2007 as a Temporary Support Personnel ("TSP") at its Big Brown mine in Fairfield, Texas.  Def.'s App. at 73, 145; Pl.'s App. at 262.  Carter worked at Big Brown mine from December 2007 to March 2008.  Pl.'s App. at 262.  On or about March 3, 2008, Plaintiff was hired as a full-time employee at Luminant's Oak Grove power plant in Franklin, Texas.  Pl.'s App. at 263; Def.'s App. at 9.  Upon his hiring, Plaintiff attended training for approximately 18 weeks at the Luminant Academy in Tyler, Texas, and then began a full-time position at Oak Grove in or around June 2008.   Pl.'s App. at 263-64.  Plaintiff worked as an Equipment Specialist at Oak Grove, responsible for ensuring that the power plant's equipment was operating safely.  Def.'s App. at 61-62; 315.  Carter was the only black worker on his crew.  Pl.'s App. at 47-48, 206.  Martin King was the only other African-American employed by Luminant at Oak Grove during Plaintiff's employment.  Pl.'s App. at 264.  Of approximately, one hundred fifty workers, there were two black employees.  Pl.'s App. at 19.  King was Plaintiff's supervisor his first few months at Oak Grove.  Pl.'s App. at 264.    Plaintiff reported to Production Shift Supervisor Darren Thomas beginning in or around November 2008.  *Id.*   Darren Thomas reported to Dwayne Coffey.[1]  Def.'s App. at 105.  Plaintiff was terminated from his position at Oak Grove in November 2009.  Pl.'s App. at 271.

### B.  Defendant Luminant's Policies

Luminant has written policies prohibiting discrimination and harassment, including that based on race, and also prohibiting retaliation against employees who report discrimination or

---

[1] The parties spell this name as "Dwayne" and "Dewayne."  The court will use the former.

harassment.  Pl.øs App. at 169.   According to the written policies, Luminant employees are directed to report complaints or concerns they have of discrimination.  Pl.øs App. at 169-170.

Luminant has a progressive discipline policy setting forth multiple levels of discipline, ranging from coaching and counseling, to formal discipline, to termination.  Pl.øs App. at 52.  If an employee fails to respond to coaching and counseling by a supervisor, or if a situation warrants formal discipline, the situation may be addressed using formal steps of discipline ô ranging from a Step One Oral Reminder, to a Step Two Written Reminder, to a Step Three Decision-Making Leave, to termination.  Pl.øs App. at 52-54; Def.øs App. at 214.  Step One is the first step of formal discipline and lasts for six months, provided no other violations or infractions occur during the six-month period.  Pl.øs App. 52, 20-22, 40.  For Step Three Decision-Making Leave, an employee is allowed time away from work, with pay, to decide whether he or she is willing to conform to the companyøs standards of conduct, rules, and practices.  Pl.øs App. at 53.  If an employeeøs decision is to return to work and abide by the companyøs rules, the supervisor will draft a letter (õStep Three letterö) to the employee confirming the employeeøs commitment and the consequences of failure to keep the commitment.   Pl.øs App. at 53.   According to Luminantøs policy, the employee should sign the letter indicating his or her commitment along with the supervisor and another management representative.  Pl.øs App.  at 53.  õIf the employee is unwilling to make such a commitment, the employee may resign or be placed on suspension which would, in all but the most unusual cases, lead to termination.ö Pl.øs App. at 54.  Luminantøs discipline policy recognizes that there may be situations in which the seriousness of an offense justifies bypassing one or more of the steps of discipline. Pl.øs App. at 52.

### C. Plaintiff's Employment-Related Complaints

Plaintiff asserts that he reported the following instances of discriminatory conduct:

1. Supervisor Darren Thomas denied Carter the opportunity to work overtime (OT) to complete the writing of KPI[2] procedures before the end of the year. Thomas, however, allowed Carter's white coworkers to work OT to write KPI procedures.  Pl.'s App. 265; Def.'s App. 39-41.

2. Darren Thomas evaluated Carter's work performance for the year as a 2 on a scale of 1 to 5 as a result of Carter's failure to write all his KPI procedures. Pl.'s App. at 267.

3. During training at Luminant Academy, after discussing victims of car wrecks, Instructor Timmons[3] stated, "Oh, by the way, there are people that are always a victim of this and a victim of that, and these people are so stupid that you need to put bleach in their gene pool." Pl.'s App. at 263; Def.'s App. at 25. Plaintiff testified that the instructor stared directly at him the entire time he was making the comment. *Id.*

4. When Carter began working on the crew for Supervisor Thomas, Thomas told Carter that he had been reading a book, and when Carter inquired what it was about, Thomas said it was about a slave, and his master helped him get a job. Pl.'s App. at 264.

5. Coworker Freddy Montelongo[4] asked Carter if he would be on the same shift the next day, and then told Carter: "We are going to get you two brooms." Pl.'s App. at 265.

6. Carter was walking to the production trailer when he was targeted with a red laser beam on his body.  Pl.'s App. at 266.

7. Coworker Andrew Nelson was giving out keys to the new break room, and he called over the radio and asked coworker Dennis McGee[5] where he was and asked McGee if he had seen Carter.  McGee replied, "Oh, we hung him!" Pl.'s App. at 267.

---

[2]Plaintiff and Defendant do not explain the term "KPI."  Plaintiff testified, however, that in completing the KPIs, the employees were basically writing startup procedures and shutdown procedures on components.  Def.'s App. at 40.  Former Luminant Employee Relations Specialist Nona Johnson testified that the Oak Grove facility was new, and, accordingly, every employee in a particular group was tasked with writing different procedures for the plant.  Def.'s App. at 164.

[3]Instructors Timmons and Mallory were contract instructors.  Def.'s App. at 21.

[4]The parties spell this name as "Montelongo" and "Montalongo."  The court will use the former.

[5]The parties spell this name as "McGee" and "Magee."  The court will use the former.

8. Carter saw a coworker, Russell Page, playing with a rope in the break room. Carter was called out to the plant on the radio but returned shortly thereafter to find Page gone and a hangman's noose hanging in the bathroom of the break room. Pl.'s App. at 271.

9. Carter was on a component monitoring an oil flush when Supervisor Thomas required Carter to go wash a truck.  According to Carter, when employees work on a component, they are not required to wash trucks.  Two other white coworkers were "floaters" and were not doing anything.  Pl.'s App. at 267.

10. Supervisor Thomas reprimanded Carter for missing work to seek medical treatment for anxiety and depression allegedly arising from race discrimination.  Pl.'s App. at 271.

11. After the 2008 elections, Supervisor Thomas made comments regarding the new Obama Administration to another coworker in Carter's presence: "I got two shotguns. You take one. I'll take one. Let's go take our country back." Pl.'s App. at 264-65.

12. On another occasion, one coworker, in the presence of a supervisor, shouted to Carter: "Carter, you see this?  This b*tch Michelle Obama.  That b*tch is out of her mind." Pl.'s App. at 265.

13. Carter was not selected for a transfer, for which he was qualified.  A white employee who allegedly did not meet the minimum requirements for the position was selected. Pl.'s App. at 270.

14. Carter was placed in Step One Discipline by Supervisor Thomas for being 30 minutes late to work.   According to Carter, his co-workers were not disciplined in a similar manner. Pl.'s App. at 268.

Carter filed a Charge of Discrimination with the Equal Employment Opportunity Commission in or around June 2009.  Pl.'s App. at 110.

### D.  Plaintiff's Transfer Requests

Carter sought Luminant's assistance to transfer to another Luminant plant or facility. Pl.'s App. at 85.  Luminant referred Carter to the company's internal job posting system.  *Id.*

During Plaintiff's employment, and in accordance with company policy, Luminant posted open positions on its internal job posting site, Career Power.  Def.'s App. at 240.  Luminant

company policy instructs employees interested in internal employment opportunities to use Career Power to search and apply for open positions. *Id.* Employees who have been in their current positions for at least six months are eligible to apply for a position posted on the Career Power site by submitting an Application for Promotion or Transfer and an Internal Transfer Form.[6] *Id.* The Internal Transfer Form is completed by the employee and contains information about the employee's current position, skills, and work history. *Id.* Employees may also attach a résumé to their Internal Transfer Form. *Id.* Recruiters then review the Internal Transfer Form and résumé, if any, and compare this information to the job description for each applied-for position to determine whether the employee satisfies the minimum qualifications for the position. *Id.* If the employee satisfies the minimum qualifications for the position, the recruiters classify the employee as a "prospect" and forward the employee's Internal Transfer Form and résumé, if any, to the hiring manager for the requested position. Def.'s App. at 240. The hiring manager then decides which employee to interview for the position. *Id.*

In 2008, Plaintiff applied for several positions with Luminant and other affiliated companies through the Career Power site. Def.'s App. at 241. Plaintiff removed himself from consideration for one of the positions, Material Specialist, because he indicated that he thought the salary was too low. *Id.* The requisition for one of the positions, Maintenance Technician, was canceled because of reorganization. *Id.* With respect to the other positions for which Plaintiff applied in 2008, Luminant determined Plaintiff was ineligible to transfer into any of those positions because he had not been in his then-current position at Oak Grove for six months. *Id.*

---

[6] "Luminant uses the six-month standard as a guideline but has made exceptions in unusual circumstances. For instance, when staffing the Oak Grove plant during its commissioning, Luminant allowed employees with less than six months in their current position to apply for jobs at Oak Grove, given the need to fully staff the new facility reasonably quickly." Def.'s App. at 240.

Plaintiff also applied for various positions in 2009. Def.'s App. at 242. Plaintiff initially met the minimum qualifications for a Multi Skill Power Craft Employee position and two Equipment Specialist positions. Luminant Recruiting Manager Darrell Jacobsen stated in his affidavit that with respect to each position for which Carter was eligible and met the minimum qualifications, the hiring managers selected a more qualified or suitable candidate. Def.'s App. at 243-44.

### E.  Plaintiff's Discipline and Termination

On December 23, 2008, Plaintiff was more than an hour late reporting to his shift. Def.'s App. at 315. On January 23, 2009, Plaintiff was late to a mandatory Occupational Safety and Health Administration ("OSHA") training meeting. *Id.* On March 8, 2009, Plaintiff was late to work because he did not adjust his clock for Daylight Savings Time. *Id.* During the period of March 12, 2009, through November 12, 2009, nine safety meetings were conducted. Pl.'s App. at 163. Carter missed five of those meetings for various reasons. *Id.* Joel Ruen, a white team member with Carter, missed the same number of safety meetings. *Id.* Carter and Ruen both missed a safety meeting on July 30, 2009, for an impermissible reason. Def.'s App. at 316. This was the only safety meeting Ruen missed for an impermissible reason. *Id.* Darren Thomas, who was also Ruen's supervisor, formally counseled both men regarding their absences from the July 30, 2009 safety meeting. *Id.* Plaintiff missed a mandatory safety meeting on October 22, 2009, for an impermissible reason. Pl.'s App. at 163.

Plaintiff states Darren Thomas placed Carter on Step One Discipline on April 3, 2009, for being approximately thirty minutes late to work on March 8, 2009, because he failed to adjust his clock for Daylight Savings Time.[7] Pl.'s App. at 40, 268. On October 3, 2009, Luminant

---

[7]Defendant states that Carter was placed on the first step of its discipline program in April 2009 because it was the third time Carter was late to work in the span of three months. Def.'s App. at 315.

removed Carter from Step One Discipline. Pl.øs App. at 41. In a letter to Carter dated October 4, 2009, regarding Carterøs õRemoval of Step I Discipline,ö Dwayne Coffey stated that Carterøs six-month period of discipline ended October 3, 2009. *Id.* The letter further stated:

> During the Discipline process, you have acknowledged your responsibility for the problem and have demonstrated your desire to follow our Code of Conduct, Policies and Procedures. Through your commitment, you have sufficiently corrected the problem. For this, I personally commend you.
>
> It is your responsibility to continue to abide by Luminant Company policies, rules, practices, and expectations. Failure to do so may subject you to further discipline.

*Id.*

In early November 2009,[8] Luminant asked Carter to sign a õStep III ó Decision Making Leaveö letter. Pl.øs App. at 58. The letter stated:

> This memo is to confirm our meeting on November 8, 2009. As discussed, your absence from the October 23, 2009 safety meeting and the excuse you offered, along with the repeated nature of your attendance problems despite previous counseling and discipline, demonstrates a blatant disregard for the Companyøs policies and procedures relating to safety.
>
> As a result, you are being placed in Step 3 ó Decision Making Leave of the Companyøs Discipline Program . . . .
>
> Anthony, as a condition of returning to work, you are required to sign this letter to acknowledge your agreement to meet the responsibilities and expectations weøve discussed. This includes taking the actions necessary to consistently follow Company policies and procedures relating to safety.

*Id.* Plaintiff refused to sign the Step Three Letter, because he believed, without further documentation supporting the letter, it would be an admission of guilt. Pl.øs App. at 60A. On November 12, 2009, Coffey sent Carter a letter stating that because Plaintiff refused to sign the

---

[8]Plaintiff testified he had a meeting with Stephen Jones, Darren Thomas, and Dwayne Coffey on November 7, 2009, regarding Step Three Discipline. Def.øs App. at 69. He had a second meeting on the next day with Bryan Barnett, Darren Thomas, and Dwayne Coffey also about Step Three Discipline, and Plaintiff refused to sign the Step Three Letter. Def.øs App. at 69. Plaintiff further testified he was given until 7:30 a.m. on November 11, 2009, to sign the document but still refused to do so. Def.øs App. at 70.

Step Three Letter, Luminant had no choice but to consider Plaintiff to have abandoned his employment and that Plaintiff was terminated, effective Wednesday, November 11, 2009. Def.'s App. at 70, 100-101.

## II.   Legal Standard for Motion for Summary Judgment

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).  A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When ruling on a motion for summary judgment, the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party.  *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).  Further, a court "may not make credibility determinations or weigh the evidence" in ruling on motion for summary judgment.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine dispute of material fact.  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).  Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment.  *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996).  Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment

evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994). The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Ragas*, 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 832 (1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23. proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

## III.    Analysis

Plaintiff asserts three claims against Defendant:[9] (1) race discrimination under Title VII and 42 U.S.C. § 1981 ("Section 1981"); (2) retaliation under Title VII and Section 1981; and

---

[9]Plaintiff Anthony Carter's Appendix in Support of His Response to Defendant's Objections to Plaintiff's Evidence Offered in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment ("supplemental appendix") was filed October 5, 2011. In his supplemental appendix, Plaintiff provided additional deposition testimony and exhibits to authenticate and lay a foundation for his summary judgment evidence. Though submitted after the deadline governing dispositive motions, briefs, and evidence (August 15, 2011), the court will, nevertheless, consider Plaintiff's supplemental appendix. The court may permit a party to properly support or address a fact that the party has previously failed to properly support. Fed. R. Civ. P. 56(e)(1). A party properly supports a fact by citing to competent summary judgment evidence. *See* Fed. R. Civ. P. 56(c)(1). Unauthenticated documents are improper as summary judgment evidence. *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994). The court will, thus, allow Plaintiff to properly support his assertions of fact with his supplemental appendix filed in response to Defendant's objections to Plaintiff's evidence in support of his summary judgment response.

racial harassment under Title VII and Section 1981,[10] and (3).  Claims arising under Section 1981 are analyzed under the same evidentiary standard and burden-shifting framework as claims arising under Title VII.  *Walker v. Thompson*, 214 F.3d 615, 625 (5th Cir. 2000), *abrogated on other grounds by Burlington Northern & Santa Fe Ry. v. White,* 548 U.S. 53, 68 (2006); *Lawrence v. Univ. of Tex. Med. Branch at Galveston*, 163 F.3d 309, 311 (5th Cir. 1999)).

### A. Discrimination

Defendant Luminant moves for summary judgment on Carter's claim for race discrimination pursuant to Title VII and 42 U.S.C. § 1981.  As plaintiff offers only circumstantial evidence of discrimination, his claim is analyzed using the modified *McDonnell Douglas* burden-shifting paradigm.  *See Jackson v. Watkins,* 619 F.3d 463, 466 (5th Cir. 2010).

To survive a motion for summary judgment, a plaintiff in a Title VII or Section 1981 discrimination case must first establish a *prima facie* case of discrimination by a preponderance of the evidence.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).  Once this *prima facie* case has been established, there is a presumption of discrimination, and the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the challenged employment action. *McDonnell Douglas*, 411 U.S. at 802-04.  If such a showing is made, the burden shifts back to the plaintiff to demonstrate that the articulated reason was merely a pretext for intentional discrimination. *Id.*

The third step of the *McDonnell Douglas* test has been altered by the Supreme Court's decision in *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003) (holding that in Title VII cases, the mixed-motives theory of discrimination is available in cases with circumstantial evidence of

---

[10]Although not specifically raised as a claim in the Complaint, some allegations therein indicate that Plaintiff asserts a claim for race discrimination based on harassment or hostile work environment.  As Defendant Luminant fully addresses this matter, the court assumes that such claim has been raised and will address it.

discrimination).   In light of *Desert Palace*, the Fifth Circuit has modified the final step of *McDonnell Douglas*.  *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.,* 482 F.3d 408, 411 (5th Cir. 2007).  To survive summary judgment under the modified *McDonnell Douglas* test, at the final step, a plaintiff must offer sufficient evidence to create a genuine dispute of material fact that either: (1) a defendant's reason is not true, but is instead a pretext for discrimination, or (2) a defendant's reason, though true, is only one of the reasons for its conduct and that another "motivating factor" is the plaintiff's protected characteristic.  *Id.* at 411-12.

After a Title VII case reaches the pretext stage, the question to be decided for the resolution of a motion for summary judgment is whether a rational factfinder could find that the employer intentionally discriminated against the plaintiff on the basis of race.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).  A "plaintiff can survive summary judgment by producing evidence that creates a jury issue as to the employer's discriminatory animus or the falsity of the employer's legitimate nondiscriminatory explanation."  *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002), *cert. denied*, 539 U.S. 926 (2003).  "Pretext-plus" is not required to support an inference of retaliatory discrimination.  *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 223 (5th Cir. 2000).  "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated," and may therefore be enough to prevent summary judgment or judgment as a matter of law.  *Reeves*, 530 U.S. at 148; *Sandstad*, 309 F.3d at 897.  This showing, however, is not always enough to prevent summary judgment "if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason

was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.ö *Reeves*, 530 U.S. at 148.

With this framework in mind, the court proceeds to analyze the partiesø arguments as to whether Carter has established a *prima facie* case and produced evidence to raise a genuine dispute of material fact that Luminantøs alleged business reason for its decisions was a pretext for discrimination.

### 1. Prima Facie Case

To establish a *prima facie* case of race discrimination in employment, Plaintiff must show:

> (1) he is a member of a protected class, (2) he was qualified for the position at issue, (3) he was the subject of an adverse employment action, and (4) he was treated less favorably because of his membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances.

*Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009). The fourth prong may also be met if a plaintiff shows that he was replaced by a person who is not a member of the protected class. *Frank v. Xerox Corp.*, 347 F.3d 130, 137 (5th Cir. 2003).

Luminant focuses on the second, third, and fourth elements of a *prima facie* case. Both parties acknowledge that Carter was a member of a protected class because of his race. The court therefore concludes that Carter has satisfied this element and addresses the remaining elements.

The Complaint alleges that Defendant is responsible for numerous instances of unlawful race discrimination. In his response to Defendantøs Motion for Summary Judgment, however, Plaintiff reduces these instances to five purported adverse employment actions: (1) Supervisor Darren Thomas placed Carter on Step One Discipline on or about April 3, 2009; (2) Dwayne Coffey blocked the transfer requests of Carter in or around August or September 2009; (3)

Darren Thomas assigned Carter to the "scrubbers" for more than two terms; (4) Darren Thomas reprimanded Carter on October 16, 2009, for taking excessive time off work; and (5) Luminant placed Carter on Step Three Discipline and terminated Carter's employment.  Pl.'s Resp. Br. at 15, 32 n.3.  The court will separately consider Carter's termination as the sixth purported adverse employment action and consider each claim of adverse employment action in light of the elements of a *prima facie* case.

The court notes at the outset that claims (2) and (6) constitute adverse employment actions.  "[I]t is beyond dispute that a termination constitutes an adverse action." *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 283 (5th Cir. 2004).  "[T]he denial of a transfer may be the objective equivalent of the denial of a promotion, and thus qualify as an adverse employment action" for purposes of Title VII.[11]   *Alvarado v. Texas Rangers*, 492 F.3d 605, 614 (5th Cir. 2007).  The court will collectively consider claims (1), (3), (4), and (5).

### a.  Plaintiff's Claims (1), (3), (4), and (5)

In the context of establishing a *prima facie* case, an adverse employment action means an "ultimate employment decision," such as "hiring, granting leave, discharging, promoting, or compensating."[12]  *McCoy v. City of Shreveport,* 492 F.3d 551, 559 (5th Cir. 2007).   Title VII does not cover "every decision made by employers that arguably might have some tangential

---

[11]"[T]he denial of a transfer *may* be the objective equivalent of the denial of a promotion, and thus qualify as an adverse employment action, even if the new position would not have entailed an increase in pay or other tangible benefits; if the position sought was objectively better, then the failure to award the position to the plaintiff can constitute an adverse employment action."  *Alvarado v. Texas Rangers*, 492 F.3d 605, 614 (5th Cir. 2007) (emphasis in original) (citation omitted).  The denial of a purely lateral transfer is not an adverse employment action redressable under Title VII.  *Id.*  at 612.  As the record is not fully developed, the court finds that a reasonable jury could conclude the position Carter sought was objectively better and that the denial of the transfer at issue was the equivalent of the denial of a promotion, as it was not a lateral transfer.  *See* Def.'s Br. at 23.

[12]The Fifth Circuit's precedent recognizing only "ultimate employment decisions" as actionable adverse employment actions in the discrimination context was unaffected by the Supreme Court's ruling in *Burlington Northern & Santa Fe Railway v. White*, 548 U.S. 53, 61-65 (2006), which abrogated the "ultimate employment decision" standard in the retaliation context.   Thus, the "ultimate employment decision" standard remains controlling for Title VII discrimination claims.  *McCoy v. City of Shreveport*, 492 F.3d 551, 560 (5th Cir. 2007).

effect upon those ultimate decisions.ö  *Banks v. E. Baton Rouge Parish Sch. Bd.*, 320 F.3d 570, 575 (5th Cir. 2003) (quoting *Burger v. Central Apartment Mgmt.*, 168 F.3d 875, 878 (5th Cir. 1999)).  An employment action that ödoes not affect job duties, compensation, or benefitsö is not an adverse employment action.  *Pegram*, 361 F.3d at 282, *abrogated in part on other grounds in retaliation cases by Burlington Northern*, 548 U.S. at 68.  Notably, it is a *major* change in compensation, duties, and responsibilities that would constitute an ultimate employment action. *Pegram*, 361 F.3d at 282 n.8 (citing *Hunt v. Rapides Health Care Sys.*, LLC, 277 F.3d 757, 770 (5th Cir. 2001)).

Imposing a higher workload than that given to other employees is not an adverse employment action under Title VII.  *Ellis v. Compass Group USA, Inc.*, 426 F. Appøx 292, 296 (5th Cir. 2011) (citing *Benningfield v. City of Houston*, 157 F.3d 369, 376-77 (5th Cir. 1998)). Allegations of unpleasant work meetings, verbal reprimands, improper work requests, and unfair treatment do not constitute actionable adverse employment actions.  *King v. Louisiana*, 294 F. Appøx 77, 85 (5th Cir. 2008) (citing *Breaux v. City of Garland*, 205 F.3d 150, 158 (5th Cir. 2000)).

The court finds that the following conduct alleged by Carter falls short of the öultimate employment decisionö standard and, thus, does not constitute adverse employment action: (1) Carterøs placement on Step One Discipline on or about April 3, 2009; (3) Carterøs assignment to the öscrubbersö for more than two terms; (4) Darren Thomasøs reprimand of Carter on October 16, 2009, for taking excessive time off work; and (5) Luminantøs placement of Carter on Step Three Discipline.[13]

---

[13]The court notes that the numerous other events of which Carter complains, detailed in Section I(C) of this opinion, although viewed in the light most favorable to Plaintiff, fall well below the öultimate employment decisionö standard.  Poor performance evaluations, unjust criticism, and being placed on probation do not constitute öultimate employment decisions.ö  *King v. Louisiana*, 294 F. Appøx 77, 84-85 (5th Cir. 2008) (citing *Mattern v. Eastman*

The court notes that Plaintiff's placement on Step Three Discipline, claim (5), is closely linked with his termination.  Under Luminant's discipline policy, signing the Step Three letter is mandatory if the employee desires to continue his employment with the company.  Def.'s App. at 214, 222-223.  Plaintiff understood his refusal to sign the letter would result in his termination.  Def.'s App. at 70.  Luminant terminated Plaintiff's employment because of his refusal to sign the Step Three Letter.  Def.'s App. at 70, 100-101.  Plaintiff alleges the Step Three Letter was inflammatory, and his placement on Step Three Discipline by Luminant was either pretextual or that race motivated the decision.  Plaintiff's Step Three discipline, however, cannot serve as the basis for his race discrimination claim because it is not an ultimate employment decision.

While an employer's actions may have increased the chance that that one would eventually suffer an adverse employment action, the possibility of discharge does not equal being discharged, and such action is not an ultimate employment decision.  *See Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 708 (5th Cir. 1997), *abrogated in part on other grounds in retaliation cases by Burlington Northern*, 548 U.S. at 68 ("To hold otherwise would be to expand the definition of "adverse employment action" to include events such as disciplinary filings, supervisor's reprimands, and even poor performance by the employee— anything which might jeopardize employment in the future. Such expansion is unwarranted.")  Adverse employment action refers to ultimate employment decisions, and not to an "interlocutory or mediate" decision that can lead to an ultimate decision.  *Id.*

As claims (1), (3), (4), and (5) alleged by Carter do not constitute adverse employment actions, the court finds Plaintiff has not established a *prima facie* case with respect to these

---

*Kodak Co.*, 104 F.3d 702, 708 (5th Cir. 1997), *abrogated in part on other grounds in retaliation cases by Burlington Northern*, 548 U.S. at 68.  Hostility from fellow employees and resulting anxiety, without more, do not constitute ultimate employment decisions, and therefore are not the required adverse employment actions.  *Mattern*, 104 F.3d at 707.

**Memorandum Opinion and Order – Page 16**

claims.   Accordingly, there is no genuine dispute as to any material fact regarding them, and Luminant is entitled to judgment as a matter of law on these claims.

### b. (6)—Plaintiff's Termination Claim

With respect to claim (6), Plaintiff's termination, Plaintiff has failed to adduce any evidence that he was replaced with a person who is not a member of the protected class or was treated less favorably because of his membership in that protected class than were other similarly situated employees who were not members of the protected class.   Plaintiff has not asserted that he was replaced by someone outside his protected class.   Pl.'s Resp. Br. at 18-23, 32 n.3. Plaintiff's arguments focus on Luminant's reason for placing him on Step Three Discipline. Specifically, Plaintiff alleges that his Step Three Letter was inflammatory and that he was treated differently than his coworkers with regard to missed safety meetings.   The court has determined that Plaintiff's Step Three Discipline cannot serve as a basis for his race discrimination claim because it is not an ultimate employment decision.   Whether Luminant treated other employees more favorably with regard to the discipline it issued for missing safety meetings is, thus, quite beside the point.   The proper inquiry is whether Luminant treated similarly situated employees more favorably with respect to the decision to terminate Plaintiff.

An employee who proffers a fellow employee as a comparator in an employment discrimination case must demonstrate that the employment actions at issue were taken under nearly identical circumstances.   *Lee*, 574 F.3d at 260.   "The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories."   *Id.*   "[C]ritically, *the plaintiff's conduct that drew the adverse employment decision*

must have been ônearly identicalö to that of the proffered comparator who allegedly drew dissimilar employment decisions.ö *Id.* (emphasis added).  It is undisputed that the conduct that ôdrewö or caused Plaintifføs termination was his failure to sign the Step Three Letter.  Def.øs App. at 70, 100-101.

Defendant asserts that Plaintiff must demonstrate that Luminant treated other employees who failed to sign a Step Three Letter more favorably.  Defendant construes the similarly-situated requirement too narrowly.  The purpose of the Step Three Letter is to confirm the employeeøs commitment to conform to the companyøs standards of conduct, rules, and practices. Pl.øs App. at 53.  Importantly, Plaintiff refused to sign the Step Three Letter because he believed the letter to be inflammatory and an admission of guilt.  Pl.øs App. at 60A.  Defendant would be insulated from liability, for example, if only Plaintiff received an ôinflammatoryö letter, while all other nonminority employees whose behavior warranted Step Three Discipline received a letter without any inflammatory accusations.  In this example, Plaintiff would assuredly be the only employee to refuse to sign the Step Three Letter and be terminated because Plaintifføs letter contained an accusation while all other letters were merely a commitment to conform to company rules.  There would not be a person similarly-situated because no other person had reason to refuse to sign the letter.  The court believes Plaintiff could show Defendant treated similarly-situated employees more favorably with respect to the decision to terminate, if Plaintiff demonstrated that other employeesø Step Three Letters did not contain accusations and were mere requests to conform to company policies.

Plaintiff, however, has failed to adduce any evidence that other employees received more favorable or less accusatory Step Three Letters.  Plaintiff has also failed to show that Luminant treated other employees who refused to sign a Step Three Letter more favorably, namely, that

Luminant did not terminate their employment. While Luminant has placed other employees at Oak Grove on Step Three Discipline (including two Caucasian employees who were not currently in any steps of discipline), none of the employees refused to sign their Step Three letters, and all of those employees continued their employment after they signed their Step Three letters. Def.'s App. at 215. As Plaintiff has not shown that a similarly-situated employee outside his protected class was treated more favorably by Luminant with regard to its decision to terminate Plaintiff, he has failed to establish a *prima facie* case for his termination claim.

### c. (2)—Plaintiff's Denial of Transfer Claim

With respect to claim (2), Plaintiff's denial of transfer, the court finds that he has established each of the elements of a *prima facie* case. The court has determined that the denial of a transfer constitutes an adverse employment action. A *prima facie* case of race discrimination based on denial of a transfer requires proof that: (1) Plaintiff belongs to a racial minority; (2) Plaintiff applied and was qualified for a job for which the employer was seeking applicants; (3) despite his qualifications, Plaintiff was rejected; and (4) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. *McDonnell Douglas*, 411 U.S. at 802. Plaintiff challenges one transfer request—Luminant's failure to transfer him to the position of Multi-Skill Power Craft employee at Lake Hubbard in 2009. Pl.'s Resp. Br. at 32. The court has determined that Plaintiff belongs to a racial minority. Luminant concedes that Plaintiff applied for and met the minimum qualifications for this position. Def.'s App. at 243. Plaintiff was rejected for this position despite his qualifications, and Luminant continued to seek applicants of complainant's qualifications because two other candidates with power plant experience were selected. *Id.* at 243-244.

### 2.   Legitimate, Nondiscriminatory Reason for Denial of Transfer

As Plaintiff has established a *prima facie* case with respect to his denial of transfer claim, the burden or production shifts to Defendant to show a legitimate, nondiscriminatory reason for its denial of Plaintiff's transfer.  Defendant argues that it denied Carter's application for transfer for the Multi-Skill Power Craft position because it selected two candidates who were more qualified than Plaintiff.  Specifically, one of the applicants selected, Crystal Palos, submitted a resume for the position that showed that she had several years of power plant experience.  Def.'s App. at 243.  The other selected applicant, Jon Scarbrough, had already been working at the Lake Hubbard plant as a contract equipment operator and maintenance technician performing the duties of this position. Def.'s App. at 243-244.  The employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus. *Burdine*, 450 U.S. at 257.  The court determines that Defendant has articulated a legitimate, nondiscriminatory reason for denying Plaintiff's request for transfer.

### 3.   Pretext or Racial Motivation

Since Defendant set forth a legitimate, nondiscriminatory reason for denying Plaintiff's application for transfer to the Multi-Skill Power Craft position, the burden shifts back to Plaintiff, who must either show that: (1) Defendant's proffered reason is not true, but is rather a pretext for discrimination or (2) Defendant's reason, although true, is only one of the reasons for this conduct and that another "motivating factor" is Plaintiff's race.  *Burrell*, 482 F.3d at 411-12.

Plaintiff argues that John Scarbrough, one of the candidates selected for the position by Defendant, did not meet the minimum requirements for the position because he did not graduate from high school.  Plaintiff also asserts that Dwayne Coffey was blocking his transfer.

Defendant argues that the position required a high school diploma, GED, or equivalent and that Plaintiff has failed to show that Scarbrough does not possess a GED or the equivalent. Defendant also contends that Plaintiff has failed to challenge Luminant's evidence that Scarbrough possessed superior qualifications based on his experience working at the Lake Hubbard plant as a contractor, performing the same duties as required by the Multi-Skill Power Craft position.

The court finds that Plaintiff has failed to meet his burden.  Plaintiff disputes the qualifications of Scarbrough.  A plaintiff may survive summary judgment and take his case to the jury by providing evidence that he was "clearly better qualified" than the employee selected for the position at issue.  *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 356-357 (5th Cir. 2001).  The single question for the trier of fact is whether the employer's selection of a particular applicant over the plaintiff was motivated by discrimination, and evidence of the plaintiff's superior qualification is thus probative of pretext.  *Id.* (citing *Deines v. Texas Dep't of Prot. & Regulatory Servs.*, 164 F.3d 277, 281 (5th Cir. 1999)).  The bar, however, is set high for this kind of evidence because differences in qualifications are generally not probative evidence of discrimination unless those disparities are "of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question."  *Id.* (citing *Deines*, 164 F.3d at 280-81).  Plaintiff has not demonstrated that no reasonable person could have chosen the candidate selected, Scarbrough, over him for the Multi-Skill Power Craft employee position.

Moreover, Plaintiff's assertion that Dwayne Coffey was blocking his transfer is unsupported, as it based on hearsay.[14]  *See* Pl.'s App. at 270.  Further, this assertion does not

---

[14]Plaintiff states in his declaration: "In or around August or September, 2009, I was told by a Luminant control room operator, Tim Acuff, that Dwayne Coffey was blocking my transfer requests."  Pl.'s App. at 270.

explain how Coffey allegedly blocked Carter's transfer or how his coworker, Tim Acuff, learned Coffey was allegedly blocking Carter's transfer. The assertion is, thus, conclusory and at most creates only a weak issue of fact. Conclusory statements, speculation, and unsubstantiated assertions cannot defeat a motion for summary judgment. *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010). Where the plaintiff creates "only a weak issue of fact as to whether the employer's reason was untrue and there is abundant and uncontroverted independent evidence that no discrimination had occurred," judgment for the movant is appropriate. *Reeves*, 530 U.S. at 148. The court determines that Plaintiff has not shown that the legitimate, nondiscriminatory reasons proffered by Defendant are pretextual or that race was a motivating factor in the decision to deny his application for transfer to the Multi-Skill Power Craft employee position. Accordingly, there is no genuine dispute of material fact with respect to Plaintiff's race discrimination claims, and Defendant is entitled to judgment as a matter of law on these claims.

### B. Retaliation

Defendant Luminant also moves for summary judgment on Carter's claim for retaliation pursuant to Title VII and 42 U.S.C. § 1981. As plaintiff offers only circumstantial evidence of retaliation, the court will apply the modified *McDonnell Douglas* burden-shifting paradigm.

It is "an unlawful employment practice for an employer to discriminate against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice" under Title VII, or "because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a); *see also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 269

---

Defendant has objected to this statement as hearsay. Plaintiff argues that this statement is admissible evidence under Federal Rule of Evidence 801(d) because Acuff was an employee of Luminant and coworker of Carter's, and the statement relates to Acuff's employment and was made during Carter's employment. The court **sustains** Defendant's objection, as Plaintiff has made no showing that decisions regarding transfers were within the scope of Acuff's employment as a control room operator. Plaintiff has not established that Acuff's statement is a party admission under Federal Rule of Evidence 801(d)(2)(D). The statement is therefore inadmissible.

(2001).   Whether the employee opposes an unlawful practice or participates in a proceeding against the employer's activity, the employee must hold a reasonable belief that the conduct he opposed violated Title VII.  *Long v. Eastfield Coll.*, 88 F.3d 300, 305 (5th Cir. 1996).

To establish a *prima facie* case of retaliation in this circuit, a plaintiff must show that: (1) he engaged in a protected activity; (2) he experienced an adverse employment action following the protected activity; and (3) a causal link existed between the protected activity and the adverse employment action.  *McCoy*, 492 F.3d at 556-57 (footnote and citation omitted);  *Montemayor v. City of San Antonio*, 276 F.3d 687, 692 (5th Cir. 2001)*; Mota v. University of Texas Houston Health Sci. Ctr.*, 261 F.3d 512, 519 (5th Cir. 2001).  The establishment of a *prima facie* case gives rise to an inference of retaliation.  *Montemayor,* 276 F.3d at 692.  This inference, in turn, shifts the burden of proof to the defendant, who must then articulate a legitimate, nondiscriminatory or nonretaliatory reason for the challenged employment action.  *McCoy*, 492 F.3d at 557.   Once a defendant asserts such a reason, the inference of discrimination or retaliation raised by the *prima facie* showing drops from the case.  *Montemayor,* 276 F.3d at 692.  At this point, summary judgment is appropriate unless the plaintiff raises a genuine dispute of material fact that the defendant's rationale is pretextual.  *McDonnell Douglas*, 411 U.S. at 801-03.

In *Burlington Northern*, the Court held that, because the discrimination and retaliation provisions of Title VII have different statutory language and different purposes, "the antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment."  548 U.S. at 64.  Consistent with this view, the Court held that a plaintiff claiming retaliation under Title VII must show that a reasonable employee would have found the alleged retaliatory action "materially adverse" in that "it well

might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (quotation marks and citation omitted). In so ruling, the Court rejected Fifth Circuit authority, *id.* at 67, which defined adverse employment actions as "ultimate employment decisions" and limited actionable retaliatory conduct to acts "such as hiring, granting leave, discharging, promoting, and compensating." *Id.* at 61 (quoting *Mattern*, 104 F.3d at 707). In evaluating whether actions are materially adverse, the Court went on to hold that "petty slights, minor annoyances, and simple lack of good manners will not" deter or dissuade a reasonable employee from making or supporting a charge of discrimination, and therefore they do not constitute conduct that is "materially adverse." *Id.* at 68.

### 1. Prima Facie Case

Plaintiff asserts several instances of protected activity, beginning with his complaint to Robert Gentry regarding comments made by instructors at Luminant Academy in March or April of 2008; the filing of an EEOC charge of discrimination in June 2009; and culminating with his complaint to Nona Johnson about a noose he discovered in the bathroom of the break room in September or October 2009. Pl.'s Resp. Br. at 13-14. Plaintiff asserts in support of his retaliation claim identical adverse employment actions to those asserted in support of his race discrimination claim: (1) Supervisor Darren Thomas placed Carter on Step One Discipline on or about April 3, 2009; (2) Dwayne Coffey blocked the transfer requests of Carter in or around August or September 2009; (3) Darren Thomas assigned Carter to the "scrubbers" for more than two terms; (4) Darren Thomas reprimanded Carter on October 16, 2009, for taking excessive time off work; (5) Luminant placed Carter on Step Three Discipline; and (6) Luminant terminated Carter's employment. The court considers each claim of adverse employment action in light of the elements of a *prima facie* case.

### a.  Plaintiff's Claim (2)

With respect to claim (2), the court has previously determined that Plaintiff's assertion that Coffey blocked the transfer requests of Carter is not based on competent summary judgment evidence.   Accordingly, Defendant is also entitled to summary judgment on claim (2) in the retaliation context.

### b.  Plaintiff's Claim (1)

The court does not discuss the first two elements of a *prima facie* case of retaliation because, even if Plaintiff satisfies these two elements, he has not satisfied the third element. With respect to Plaintiff's claim (1)— Supervisor Darren Thomas's placement of Carter on Step One Discipline— the court finds that that Plaintiff has not established a causal link between the alleged retaliatory act and a protected activity.  The court now turns to the issue of causation.

To establish the causation prong of a *prima facie* case, a plaintiff arguing retaliation must show the decision-maker was aware of the protected activity.  *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 883-84 (5th Cir. 2003) (citing *Chaney v. New Orleans Pub. Facility Mgmt., Inc.*, 179 F.3d 164, 168 (5th Cir. 1999) ("If an employer is unaware of an employee's protected conduct at the time of the adverse employment action, the employer plainly could not have retaliated against the employee based on that conduct.")  The court finds that Plaintiff has not produced evidence demonstrating that Supervisor Thomas had knowledge of his protected activity at the time of the alleged retaliatory act.

Plaintiff asserts he was placed on Step One Discipline on April 3, 2009.  Pl.'s App. at 40, 41.  Plaintiff has failed to produce evidence that Darren Thomas had knowledge of Plaintiff's alleged protected activity on or before April 3, 2009.  The incidents of alleged protected activity, prior to April 3, 2009, include: making a complaint to Robert Gentry regarding comments made

by instructors at Luminant Academy in March or April of 2008 (Pl.øs App. at 263); complaining to Dwayne Coffey regarding delayed expense reimbursements in July 2008 (Pl.øs App. at 264); complaining to Darren Thomas regarding Mike Cockerhamøs instruction for Plaintiff to get to the back of the group in November 2008 (Pl.øs App. at 264); making a complaint to human resources in January 2009 regarding comments made by Freddy Montelongo (Pl.øs App. at 266); making a complaint to Revis Goodwin in February 2009;[15] making complaints to Darren Thomas and Mickey Woosley in February 2009 that he was being õsingled outö[16] (Pl.øs App. 056, 266); and complaining to Darren Thomas regarding the õhung himö comment in March 2009[17] (Pl.øs App. at 199). Pl.øs Resp. Br. at 13-14.

Plaintiff only obliquely references that Darren Thomas had knowledge of three instances of protected activity: Plaintifføs complaint to Darren Thomas regarding Mike Cockerhamøs instruction for him to get to the back of the group; Plaintifføs complaint to Darren Thomas that he was being õsingled out;ö and Plaintifføs complaint to Darren Thomas regarding the õhung himö comment.

---

[15]Plaintiff asserts in his response brief that he opposed racial discrimination by making a complaint to Revis Goodwin in February 2009. Pl.øs Resp. Br. at 14. Plaintiff provides no support for this assertion. Plaintifføs declaration states he had a conversation with Revis Goodwin on or about April 28, 2009. Pl.øs App. at 268. Plaintifføs Appendix reflects a conversation with Revis Goodwin on April 3, 2009. Pl.øs App. at 82.

[16]Defendant objects to Plaintifføs Exhibit 3 (Pl.øs App. at 56), attached as an excerpt from the Deposition of Darren Thomas, pursuant to Federal Rules of Evidence 602, 801, 802, 901 on the bases that it is unauthenticated, lacks a proper foundation, and contains hearsay statements of the Plaintiff. Exhibit 3 is an e-mail from Darren Thomas to himself documenting a meeting attended by him, Plaintiff, and Mickey Woolsey. The court **overrules** Defendantøs objections on the bases that Exhibit 3 is unauthenticated and lacks a proper foundation. The testimony of Darren Thomas provided in Plaintifføs supplemental appendix provides evidence sufficient to support a finding that the evidence in question is what its proponent claims it to be. Thomas testified that Exhibit 3 was an e-mail he prepared to document a discussion between Plaintiff and his supervisor, Woolsey, which Thomas observed. The court finds that deposition testimony of Thomas provided by Plaintiff in his supplemental appendix provides a proper foundation. The court also finds that Exhibit 3 is not hearsay, as it is an admission by a party-opponent within the meaning of Federal Rule of Evidence 801(d)(2). The court **overrules as moot** Defendantøs hearsay objection regarding Plaintifføs statements within the document, as the court does not consider the statements for the truth of the matter asserted but rather for the fact that the statements were made.

[17]Plaintifføs response brief alleges that he opposed race discrimination by complaining to Darren Thomas about the õhung himö comment in March 2009. Pl.øs Resp. Br. at 14. The court later determines in its analysis that the summary judgment evidence shows Plaintiff Carter made this complaint in April 2009.

Plaintiff asserts that, in November 2008, he complained to Darren Thomas regarding Mike Cockerham's instruction for him to get to the back of the group. Pl.'s Resp. Br. at 14. Plaintiff supports this assertion with paragraph 11 of his declaration. *Id.* Plaintiff's declaration does not support his contention that he reported Cockerham's instruction to Darren Thomas. Pl.'s App. at 264. Accordingly, Plaintiff has not adduced any evidence that Thomas had knowledge of his alleged complaint. Further, Plaintiff has adduced insufficient evidence to show he held a reasonable belief that the conduct he allegedly opposed— Cockerham's instruction to go to the back of the group— violated Title VII. Plaintiff has not demonstrated that Cockerham's demand that Carter go to the back of the group had anything to do with Plaintiff's protected characteristic or that it somehow related to protected activity. Accordingly, Plaintiff's bald assertion that he reported Cockerham's instruction to Darren Thomas does not constitute protected activity of which Thomas could have known.

With respect to his complaint to Darren Thomas and Mickey Woolsey in February 2009 that he was being "singled out," Plaintiff did not indicate that he was singled out on the basis of race such that his complaint could constitute protected activity of which Thomas could have known. Pl.'s App. 056, 266. Magic words are not required, but protected opposition must at least alert an employer to the employee's reasonable belief that unlawful discrimination is at issue. *See, e.g., Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 349 (5th Cir. 2007) (holding that the plaintiff failed to establish a protected activity when her e-mail to a human resources representative complaining of a deteriorating working relationship with the alleged retaliator contained no reference to conduct that could be considered discriminatory in nature). *See also Brown v. UPS,* 406 F. App'x 837, 840 (5th Cir. 2010) (Although the plaintiff, an African-American employee filed a union grievance wherein he asserted, "I do feel

discriminated upon by CTRMGR Mike Bates because of his actions," and complained about unfair work distribution, unpaid overtime, and selective enforcement of a lunch policy shortly before his termination, his grievance did not constitute protected activity because he did not complain about race, color, religion, or national origin discrimination.)

Though Plaintiff asserts he complained to Darren Thomas regarding the "hung him" comment in March 2009 (Pl.'s Resp. Br. at 14), Plaintiff's summary judgment evidence actually shows that Plaintiff made this complaint on April 4, 2009. Pl.'s App. at 199. Carter's summary judgment evidence shows Darren Thomas placed him on Step One Discipline on April 3, 2009. Pl.'s App. at 40, 41. Plaintiff's Step One Discipline occurred before Carter complained to Thomas regarding the "hung him" comment. As Carter has not produced evidence demonstrating that Supervisor Thomas had knowledge of his alleged protected activity at the time Thomas placed him on Step One Discipline on April 3, 2009, Carter's Step One Discipline cannot form the basis of a retaliation claim.

### c. Plaintiff's Claim (3)

The court does not discuss the first two elements of a prima facie case of retaliation because, even if Plaintiff satisfied these two elements, he has not satisfied the third element. With respect to Plaintiff's claim (3), the court also finds that that Plaintiff has not established a causal link between the alleged retaliatory act and a protected activity.

Defendant argues, regarding Plaintiff's claim (3)— Thomas assigned Plaintiff to the "scrubbers" for more than two terms— that Carter was unaware who assigned him to the scrubber system, and thus has no evidence that such person had any knowledge of any of Carter's discrimination complaints. Def.'s Mot. for Summ. J. Br. at 43. Defendant points to testimony by Plaintiff where he assumes that it was his supervisor who made the schedule to put him on

successive "scrubbers" rotations.  Def.'s App. at 41.   When asked if he knew who made the schedule, Carter replied: "No, I really don't, ma'am."  *Id.*  Plaintiff asserts in his declaration that "Supervisor Thomas kept me on scrubbers for an additional two terms . . . ."  Pl.'s App. at 269.

Plaintiff uses his September 5, 2011 declaration to counter his May 10, 2011 sworn deposition testimony and tell a different story.  "[A] party may not defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony."  *Copeland v. Wasserstein, Perella & Co., Inc.*, 278 F.3d 472, 482 n.21 (5th Cir. 2002) (citing *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996)).   This rule also applies even when the affidavit (or declaration) contradicts prior sworn testimony by the affiant himself.  *Id.*  When an affidavit merely supplements or clarifies rather than contradicts prior deposition testimony, the court may consider the affidavit when evaluating genuine issues in a motion for summary judgment.   *Infax*, 72 F.3d at 496.   Carter's declaration does not merely supplement his deposition; it tells the story differently.   As Carter has not provided an explanation for this different version, the court concludes the portion of Carter's declaration stating definitively that it was Thomas who made the decision to keep him on "scrubbers" for an additional two terms cannot be used to demonstrate that Thomas was responsible for this decision.

As Plaintiff has not produced competent summary judgment evidence as to whom made the decision to keep him on "scrubbers" duty for an additional two terms, he cannot demonstrate that the alleged retaliator had knowledge of the alleged protected activity.   Accordingly, Plaintiff's claim (3)— Thomas's assignment of Carter to "scrubbers" duty for more than two terms— cannot form the basis of a retaliation claim.

### d.  Plaintiff's Claim (4)

The court does not discuss the first two elements of a prima facie case of retaliation because, even if Plaintiff satisfies these two elements, he has not satisfied the third element. With respect to Plaintiff's claim (4)—Thomas's reprimand of Carter on October 16, 2009, for taking excessive time off work—the court also finds that that Plaintiff has not established a causal link between the alleged retaliatory act and a protected activity.

Plaintiff argues that the temporal proximity of Luminant's receipt and review of his EEOC charge in August 2009[18] and his alleged reprimand establish the necessary causal connection.  Pl.'s Resp. Br. at 18.  "Close timing between an employee's protected activity and an adverse action against [him] may provide the 'causal connection' required to make out a prima facie case of retaliation." *Evans v. Houston*, 246 F.3d 344, 354 (5th Cir. 2001) (citation omitted).

Plaintiff, however, has adduced no evidence that Darren Thomas was aware of his EEOC charge at the time of his October 16, 2009 reprimand.  Luminant's position statement provided to the EEOC in response to Carter's charge of discrimination states that Luminant made Coffey and Thomas aware of Carter's charge because of their positions and knowledge of the relevant facts. Pl.'s App. at 197.   The position statement, which Carter offers in support of the assertion that Thomas had knowledge of his EEOC charge, however, does not show *when* Coffey and Thomas became aware of his charge.  Accordingly, Plaintiff has not provided evidence that Thomas was aware of his protected activity prior to the alleged retaliatory act; thus, this protected activity cannot serve as the basis for retaliation in with respect to Plaintiff's claim (4).

---

[18]The summary judgment evidence shows that Brian Hinton, Employee Relations Manager during the time of Carter's employment, received Carter's EEOC charge of discrimination on or before July 30, 2009, and stated that he intended to review the charge on August 3, 2009.  Pl.'s App. at 246.

**Memorandum Opinion and Order – Page 30**

Plaintiff lists two incidents after the filing of his EEOC charge in June 2009,[19] which purportedly constitute protected activity: Plaintiffs complaint in July 2009 to Darren Thomas in his mid-year review that he was trying to come to grips with the culture at Oak Grove and Plaintiff's complaint to Nona Johnson (human resources) in September or October 2009 that he discovered a noose in the bathroom of the break room. Pl.'s Resp. Br. at 14.  Plaintiff's mid-year review does not constitute protected activity, such that Thomas would have the requisite knowledge, as Plaintiff only very generally explains that he had to work through adversity and resistance from time to time and that he had had to "come to grips" with the fact that the culture he is dealing with requires a different approach. *See* Pl.'s App. at 249.  Plaintiff's assertions contain no reference to conduct that could be considered racially discriminatory in nature and in no way alert his employer that he reasonably believed that unlawful discrimination was at issue. With respect to his complaint to Nona Johnson about the noose, Plaintiff adduces no evidence that his supervisor, Darren Thomas, had any knowledge of this complaint. Pl.'s App. at 271. Plaintiff only asserts that he reported the event to Nona Johnson shortly after it occurred. *Id.*

As Plaintiff has not established a causal link between the alleged retaliatory act and a protected activity for claims (1), (3), and (4), the court finds Plaintiff has not established a *prima facie* case with respect to these claims.  Accordingly, there is no genuine dispute as to any

___

[19]The court has already determined that Plaintiff has failed to demonstrate that Thomas had knowledge of any protected activity that Plaintiff engaged in prior to April 3, 2009.  The only instance of alleged protected activity that occurred between April 3, 2009, and the filing of Plaintiff's EEOC charge occurred on April 4, 2009, when Plaintiff complained to Thomas about the "hung him" comment.  Pl.'s Resp. Br. at 14.  Carter's complaint to Thomas on April 4, 2009, occurred six months before Thomas's alleged wrongful reprimand.  Cases that accept mere temporal proximity as sufficient evidence of causality to establish a *prima facie* case uniformly hold that the temporal proximity must be very close. *Strong v. University Health Care Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007) (citing *Breeden*, 532 U.S. at 273).  A time lapse of up to four months has been found sufficient to satisfy the causal connection required to make out a prima facie case of retaliation for summary-judgment purposes. *Evans*, 246 F.3d at 354.  Plaintiff has not argued, and the court does not find, that the proximity of Plaintiff's April 2009 complaint and the October 2009 reprimand— a six-month time period— demonstrates the close temporal proximity necessary to establish the requisite causal link. *See, e.g., Raggs v. Mississippi Power & Light Co.*, 278 F.3d 463, 471-72 (5th Cir. 2002) (holding a five-month time period, without other evidence, did not establish the requisite causal link).

material fact regarding these claims, and Luminant is entitled to judgment as a matter of law on these claims.

### e.  Plaintiff's Claims (5) and (6)

With respect to Plaintiff's claims (5) and (6), the court determines Plaintiff has established the elements of a *prima facie* case.  The court notes that Plaintiff's claims (5) and (6) are actions that were allegedly taken by Luminant as opposed to actions taken only by Supervisor Thomas, as in Plaintiff's claims (1), (3), and (4).

The court finds Plaintiff engaged in protected activity on at least two occasions: his complaint to Darren Thomas regarding the "hung him" comment in April 2009 and his filing of an EEOC charge of discrimination in June 2009.  Carter reported to Thomas that when co-worker Andrew Nelson was giving out keys to the new break room, Nelson called over the radio and asked co-worker Dennis McGee where he was and if he had seen Carter.  Pl.'s App. 199, 267.  McGee replied, "Oh, we hung him!"  Pl.'s App. at 267.

The court concludes, without pause, that when Carter reported the "hung him" comment to Thomas that Carter was opposing conduct he reasonably believed to be race-based and discriminatory in violation of Title VII.  It is common knowledge that many black men were lynched (illegally hanged) after the Civil War and well into the twentieth century for the commission or alleged commission of a crime, or for "getting out of their place."  Therefore, any reference to the terms "hang(ed)," "hung," "rope," "noose," or the like, in the context described by Carter, can be reasonably interpreted to refer to an African-American man being illegally put to death, usually by a mob of misguided individuals seeking vigilante justice.  It is fatuous for any reasonably intelligent person to not connect the use of search terms to an African-American male.  The use of these terms in a discriminatory or racial manner, as described by Carter, even

when purportedly used jokingly, serves *no* purpose in the workplace other than to foment and perpetuate invidious race discrimination.  Carter's EEOC charge of discrimination is precisely the type of charge contemplated under 42 U.S.C. § 2000e-3(a) and thus constitutes protected activity.

The court also concludes that Plaintiff's claims (5) and (6) constitute adverse employment actions that followed Plaintiff's protected activity.  Claims (5) and (6) occurred in November 2009, after the two abovementioned instances of protected activity.  The court has previously noted that the definition of adverse employment action differs in the context of retaliation because the Supreme Court abrogated the Fifth Circuit's "ultimate employment decision" approach to adverse employment actions in the retaliation context in favor of a less-exacting standard.  *McCoy*, 492 F.3d at 559.  Accordingly, the adverse employment action element encompasses a broader range of conduct in the retaliation context than it does in the discrimination context.  For an employment action to qualify as adverse under the anti-retaliation provisions, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington Northern*, 548 U.S. at 68 (internal citations omitted).

The court determines that Plaintiff's claim (6)—termination of Carter's employment—constitutes an adverse employment action in the retaliation context, as this claim met the more-exacting "ultimate employment decision" standard in the discrimination context.  *Burlington Northern* strongly suggests that it is for a jury to decide whether anything more than the most petty and trivial actions against an employee should be considered "materially adverse" and thus constitute adverse employment actions.  Accordingly, the court likewise finds a jury could

reasonably find that Plaintiff's claim (5)– Luminant's placement of Carter on Step Three Discipline– was a materially adverse action which would dissuade a reasonable worker from making or supporting a charge of discrimination.

With respect to Plaintiff's claims (5) and (6), the court concludes Plaintiff has established a causal link between a protected activity and the adverse employment actions. The standard for establishing the "causal link" element of the plaintiff's *prima facie* case is much less stringent than "but for" causation. *Long*, 88 F.3d at 305 n.4. "[A] plaintiff need not prove that [his] protected activity was the sole factor motivating the employer's challenged decision in order to establish the ‗causal link' element of a prima facie case." *Id.* A "causal link" is established when the evidence demonstrates that "the employer's decision to terminate was based in part on knowledge of the employee's protected activity." *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001).

Plaintiff has produced evidence demonstrating that Luminant received Carter's EEOC charge of discrimination on July 30, 2009, and began reviewing it in early August 2009. Pl.'s App. at 246; Def.'s App. at 215. Approximately three months later, Carter was placed on Step Three Discipline, in early November 2009, and was terminated effective, November 11, 2009. A time lapse of up to four months has been found sufficient to satisfy the causal connection required to make out a *prima facie* case of retaliation for summary judgment purposes. *Evans*, 246 F.3d at 354.

Plaintiff has also established that employee relations, human resources, labor relations, the legal department, and members of leadership were involved in placing him on Step Three Discipline and/or drafting his Step Three letter. Pl.'s App. at 66. Dwayne Coffey testified that he was involved in drafting Plaintiff's Step Three Discipline Letter. Pl.'s App. at 25. At the

time these constituents from the company met to discuss their plan of action regarding Carter, Coffey was aware that Carter had made complaints of discrimination in April and had filed a charge of discrimination with the EEOC. Pl.'s App. at 27, 28. A timeline was prepared by Coffey, which was considered in the decision to put Plaintiff on Step Three Discipline.[20] Pl.'s App. at 33, 191. The timeline contained entries relating to Carter's complaints of discrimination. Pl.'s App. at 59. Coffey testified that one of the things put in the timeline that was considered in deciding whether to put Carter on Step Three Discipline was his discrimination allegations. Pl.'s App. at 35-36. Plaintiff also presents evidence that a group of white crew members complained about Carter on September 29, 2009, stating the crew was "walking on pins and needles and looking over their shoulder that Anthony Carter would take something out of context and get them in trouble because this has happen[ed] in the past."[21] Pl.'s App. at 57, 219-220. Brian Barnett, speaking for the crew, "wanted to know what could be done to help the situation." Pl.'s App. at 57. Jerry Haun told the crew that "everyone needs to be respectful and diverse no matter who was around during their conversations." Pl.'s App. at 57; Pl.'s Supp. App. at 84-90. This

---

[20]Defendant objects to Plaintiff's Exhibit 8 (Pl.'s App. at 59-60), attached as an excerpt from the Thomas Deposition, pursuant to Federal Rules of Evidence 602, 801, 802, 901 on the bases that it is unauthenticated, lacks a proper foundation, and contains hearsay statements of the Plaintiff. Exhibit 8 is an e-mail from Dwayne Coffey to Nona Johnson and other Luminant employees with a timeline attached to the e-mail. The court overrules Defendant's objections on the bases that Exhibit 8 is unauthenticated and lacks a proper foundation. The testimony of Nona Johnson, a recipient of the e-mail, provided by Plaintiff in his appendix (Pl.'s App. at 191) provides evidence sufficient to support a finding that the evidence in question is what its proponent claims it to be. The court also finds that deposition testimony of Ms. Johnson provided by Plaintiff in his appendix provides a proper foundation. The court **overrules** Defendant's objections that Plaintiff's statements within Exhibit 8 are hearsay. The court finds the statements are not offered to prove the truth of the matter asserted but instead to demonstrate Defendant's knowledge of the assertions.

[21]Defendant objects to Exhibit 6 (Pl.'s App. at 57), attached as an excerpt from the Thomas Deposition pursuant to Federal Rules of Evidence 602 and 901 on the bases that it is unauthenticated and lacks a proper foundation. Exhibit 6 is Jerry Haun's documentation of the meeting that occurred on September 29, 2009. The document indicates that Jerry Haun attended the meeting. Jerry Haun testified that he prepared Exhibit 6 (or its equivalent - Exhibit 54) after the meeting (Pl.'s Supp. App. at 84-90A). The court **overrules** Defendant's objections as the testimony of Jerry Haun provided in Plaintiff's supplemental appendix offers evidence sufficient to support a finding that the evidence in question is what its proponent claims it to be. The court finds that deposition testimony of Haun provided by Plaintiff in his supplemental appendix establishes an adequate foundation to consider the testimony. Moreover, the court declines to exalt form over substance at the summary judgment stage.

September 29 meeting was referenced on the timeline provided by Coffey to the decision-makers "to evaluate further discipline." Pl.'s App. at 33, 59-60.  Plaintiff has also established that his termination resulted from his placement on Step Three Discipline and his subsequent failure to sign the Step Three Letter.  Pl.'s App. at 60A; Def.'s App. at 70, 100-101.

The court concludes that these facts, viewed in the light most favorable to Plaintiff, demonstrate the causal connection required to show a *prima facie* case.

### 2.   Legitimate, Nondiscriminatory Reason

As Plaintiff has established his *prima facie* case with respect to claims (5) and (6), the burden shifts to Defendant to articulate a legitimate, nonretaliatory reason for its employment action. *McCoy*, 492 F.3d at 557.  Defendant's burden is only one of production, not persuasion, and involves no credibility assessment. *Id.*

The court concludes that Luminant has articulated a legitimate, nonretaliatory reason for the remaining alleged retaliatory acts: Luminant placed Carter on Step Three Discipline in November 2009 because he missed three mandatory safety meetings without excuse between July 2009 and October 2009.[22]  Def.'s App. at 228-29, 317.  Luminant terminated Plaintiff's employment in November 2009 because he refused to sign his Step Three Discipline letter acknowledging his commitment to comply with the company's rules.  Def.'s App. at 317.

### 3.   "But for" Causation

Plaintiff contends that for purposes of surviving a motion for summary judgment, "it is enough that Carter offer circumstantial evidence that could allow a jury to reasonably conclude

---

[22]Plaintiff and Defendant dispute whether Carter was placed on Step Three Discipline for missing one safety meeting or three safety meetings.  At this stage, however, the issue is inconsequential, as Defendant need not persuade the court that it was actually motivated by the proffered reasons.  It is sufficient if Defendant's evidence raises a genuine issue of fact as to whether it discriminated or retaliated against Plaintiff.  *Burdine*, 450 U.S. at 254. The employer's burden is only one of production, not persuasion, and involves no credibility assessment. *McCoy*, 492 F.3d at 557.  The court finds that Defendant has met its burden, regardless whether Plaintiff's discipline was due to missing a single meeting or multiple meetings.

**Memorandum Opinion and Order – Page 36**

that the final decision-maker responsible for the adverse employment action taken against the plaintiff was at least in part motivated by [his] protected activity.ö  Pl.øs Resp. Br. at 13.  The standard is more accurately stated as follows: If defendant meets its burden of production, the plaintiff bears the ultimate burden of proving that either: (1) the employerøs proffered reason is a pretext for retaliation (pretext alternative), or (2) that the employerøs reason, although true, is but one of the reasons for its conduct, another of which was the plaintifføs protected conduct (mixed-motives alternative). *Keelan*, 407 F.3d at 341.

In *Smith v. Xerox*, 602 F.3d at 322, the Fifth Circuit held that in retaliation cases, as in other Title VII cases, the plaintiff is not required to present direct evidence of retaliation in order to obtain a mixed-motive jury instruction.  Instead, a plaintiff may argue a mixed-motive theory using either direct or circumstantial evidence.  *Id.*  õHowever, where no evidence of the kind required for a mixed-motive theory is present, the case proceeds under a ÷pretextø analysis, where the ÷burden returns to the plaintiff to prove that the protected conduct was a ÷but forø cause of the adverse employment decision.ö  *Plumlee v. City of Kennedale,* ___ F. Supp. 2d ___, 2011 WL 2550807 (N.D. Tex. June 27, 2011) (citing *Hernandez v. Yellow Transp.*, *Inc.*, 641 F.3d 118, 129 (5th Cir. 2011) (requiring õbut forö causation under a pretext alternative).  Despite his discussion of the mixed-motive alternative, Plaintiff argues only pretext.  Accordingly, the court will not consider the mixed-motive alternative.

Under a pretext alternative, a plaintiff may avoid summary judgment on õbut forö causation by demonstrating a conflict in substantial evidence on this ultimate issue.  *Hernandez*, 641 F.3d at 132.  Evidence is õsubstantialö if it is of such quality and weight that reasonable and fair-minded [persons] in the exercise of impartial judgment might reach different conclusions. *Id.* õAfter the employer has produced evidence to rebut the employeeøs *prima facie* case of

retaliation, the showing that the plaintiff must make to establish causation is more onerous than that initially required to present a *prima facie* case." *Arrieta v. Yellow Transp., Inc.*, 2008 WL 5220569, at *17 (N.D. Tex. Dec. 12, 2008), *aff'd*, 641 F.3d at 128 (citing *Phillips v. Credit Lyonnais*, 2002 WL 1575412, at *8 n.4 (N.D. Tex. July 16, 2002); *Long*, 88 F.3d at 305 n.4. "[T]iming can sometimes be a relevant factor in determining whether a causal connection exists where the timing between a protected activity and an adverse employment action is 'suspicious[ly]' proximate." *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 418 n.9 (5th Cir. 2003) (citing *Shackelford v. DeLoitte & Touche, LLP,* 190 F.3d 398, 409 (5th Cir. 1999)). Evidence of temporal proximity between the protected act and the adverse employment action alone, however, is insufficient to create a genuine dispute of material fact regarding "but for" causation. *Strong v. University Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007).

The court determines that Carter has raised genuine disputes of material fact on the ultimate "but for" causation issue for Plaintiff's claims (5) and (6). With respect to claim (5), the ultimate issue on summary judgment is whether Carter produced evidence that could support a finding that he would not have been placed on Step Three Discipline in the absence of his having engaged in protected conduct. *See Shackelford*, 190 F.3d at 409. Carter presents evidence to rebut Luminant's claim that he was placed on Step Three Discipline because of his unexcused absences from three mandatory safety meetings. He has shown temporal proximity between his protected activity and his Step Three Discipline, and has established that Luminant considered his complaints of race discrimination and the September 29 meeting while evaluating whether further discipline was necessary.

Further, Carter contends Luminant wrongfully "jumped" him from zero discipline to Step Three Discipline. Carter explains that on October 4, 2009, Dwayne Coffey removed him from

Step One Discipline in a letter acknowledging that Carter had sufficiently corrected the problem. Pl.'s App. at 41.  Less than six weeks later, in early November 2009, Luminant requested that Carter sign a Step Three Letter drafted by upper management. Pl.'s App. at 25-26.  Carter produces evidence that the only incident that occurred between his removal from Step One Discipline and his placement on Step Three Discipline is one missed safety meeting in late October 2009.  Pl.'s App. at 28-29.  Luminant disputes Carter's contention that his Step Three Discipline was as a result of a single missed safety meeting.  Luminant asserts that Carter was placed on Step Three Discipline due to his repeated unexcused absences at safety meetings and his "flippant" attitude in response to Coffey when Coffey inquired why Carter had missed the safety meeting in late October.  Def.'s App. at 317.  Carter and Luminant dispute whether it was a violation of Luminant's policy to bypass a step of discipline in this instance.[23]

The court notes that Carter and Luminant also dispute whether Carter's Step Three Letter was in conformity with Luminant's policy.[24]  Carter asserts his Step Three Letter contained "false, inflammatory allegations," and that Luminant's policy does not provide for any language in Step Three Letters other than language requiring the employee to confirm his commitment to the company.  Pl.'s Resp. Br. at 20.  Luminant contends that its policy does not provide an exhaustive list of every bit of information that should go into the letter and states that Plaintiff cannot credibly contend that the letter was false or inflammatory considering Plaintiff's admission to missing three safety meetings.  Def.'s Reply Br. at 19.  "A defendant's failure to follow its own policy is not probative of discriminatory animus in absence of proof that the

---

[23]Luminant's discipline policy recognizes that "there may be particular situations in which the seriousness of an offense justifies bypassing one or more of the steps of discipline . . . ." Pl.'s App. at 52.

[24]Luminant characterizes Carter's argument as a disagreement with its business policy of requiring employees to sign Step Three Letters.  Def.'s Reply Br. at 23.  Carter's argument is actually that the Step Three letter issued to *him* was not in conformity with Luminant's policy, that is, Luminant discriminatorily applied its policy with respect to Carter's Step Three Letter. Pl.'s Resp. Br. at 20.

plaintiff was treated differently than other nonminority employees because Title VII does not protect employees from the arbitrary employment practices of their employer, only their discriminatory impact." *Turner*, 476 F.3d at 346 (citation omitted).  Carter's argument is, thus, unavailing as he has not produced evidence that nonminority employees were issued noninflammatory Step Three Letters.

Finally, Carter argues that Luminant treated him differently than similarly-situated white coworkers.  For example, Carter argues that he missed the same number of safety meetings as Joel Ruen.  Pl.'s App. 163, 177-179.  This argument is equally unavailing.  Defendant asserts that Plaintiff has failed to account for whether Ruen's and other employee's absences were excused.  The court agrees.  Luminant has established that employees are excused from safety meetings if they are taking preapproved time off or are absent on company business on the day of the meeting. Def.'s App. at 315.  Otherwise, employees who miss safety meetings are subject to the company's discipline policy. *Id.*  The summary judgment evidence demonstrates that Ruen had a single unexcused absence (Pl.'s App. at 163), where Plaintiff had two or three[25] unexcused absences. Pl.'s App. at 163; Def.'s App. at 316-17.  Although Plaintiff testified that coworkers Joel Ruen and Andrew Nelson received no discipline, he also testified that he does not know how he "knows" that coworkers Joel Ruen and Andrew Nelson were not disciplined for missing a safety meeting.  Def.'s App. at 58, 65.  Thus, Plaintiff does not have personal knowledge regarding the alleged lack of discipline against these two employees, and the court cannot rely on this evidence in support of the assertion that Carter was treated differently than similarly-situated employees.

---

[25]Luminant counts plaintiff's July 2, 2009, absence as unexcused. Def.'s App. at 316.  Pl.'s absence on July 2 was due to illness.  Pl.'s App. at 163.  The court is unsure, based upon the evidence, whether Plaintiff's illness constituted an excused or unexcused absence.  Accordingly, it is unclear whether Plaintiff had two or three unexcused absences during the period of March 12, 2009, through November 12, 2009.  Whether Plaintiff had two or three unexcused absences, he still had more unexcused absences than Joel Ruen.

With respect to Plaintiff's claim (6), the ultimate issue on summary judgment is whether Carter produced evidence that could support a finding that he would not have been terminated in the absence of his having engaged in protected conduct.  In the discrimination context, the court could not consider Plaintiff's placement on Step Three Discipline, as it did not constitute an "ultimate employment decision."  The court, nevertheless, found that Defendant construed the similarly-situated requirement too narrowly and that Defendant would effectively be insulated from liability if, for example, only Plaintiff received an "inflammatory" letter, while all other nonminority employees whose behavior warranted Step Three Discipline received a letter without any inflammatory accusations.  Though the court determines that Plaintiff has not adduced evidence that other employees received noninflammatory letters, it finds that Plaintiff has adduced evidence to raise a genuine dispute of material fact as to whether Defendant used its Step Three Discipline policy in a retaliatory manner.

Luminant asserts it was justified in terminating Carter for his failure to sign the Step Three Letter because it is Luminant's policy to require employees in Step Three Discipline to sign such letters, and Carter failed to sign the letter.  Carter argues that he was terminated for refusing to sign a letter that was intentionally drafted in a manner such that he would refuse to sign it.  Carter has produced evidence that Luminant's decision-makers knew from Carter's employment history that if Carter disagreed with a document, he would refuse to sign it.  Pl.'s App. at 247.  Carter had previously refused to sign a performance appraisal because he did not agree with it.  *Id.*  Darren Thomas, a recipient of Coffey's timeline e-mail, documented with respect to Carter's refusal to sign his evaluation, that Carter "doesn't sign anything that he doesn't agree with."[26]  *Id.*  Plaintiff's refusal to sign his performance appraisal was documented

---

[26]Plaintiff's statement documented by Thomas is not hearsay, as it is not used for the truth of the matter asserted but instead to show Luminant's knowledge of Plaintiff's assertion.

in the timeline distributed by Coffey and considered by Luminant's constituents to evaluate Plaintiff's discipline.  Pl.'s App. at 60.

The court finds that the evidence in the record, when viewed in its totality and in the light most favorable to Carter, is sufficient to create a genuine dispute of material fact as to whether Luminant placed Carter on Step Three Discipline and terminated him in retaliation for activities protected by Title VII.  A reasonable jury could choose to believe Carter's account of the events leading up to his termination. The totality of this evidence is sufficient to support the inference that Luminant did not actually discipline and terminate Carter because of his attendance record at safety meetings but instead placed him on Step Three Discipline and terminated him in retaliation for his protected activity.  The combination of suspicious timing with other significant evidence of pretext can be sufficient to survive summary judgment. *Shackelford*, 190 F.3d at 409 (citing *Long*, 88 F.3d at 308).   The court finds that Plaintiff has met his burden.

Accordingly, Defendant is entitled to summary judgment, in the retaliation context, on all claims, except claims (5) and (6).   With respect to claims (5) and (6), the court finds Plaintiff has demonstrated a conflict in substantial evidence on the ultimate "but for" causation issue.

### C.  Harassment/Hostile Work Environment

Defendant Luminant moves for summary judgment on Carter's claim for race harassment based on hostile work environment under Title VII and 42 U.S.C. § 1981.   Ordinarily, to establish a *prima facie* case of racial harassment alleging hostile work environment, an employee must raise a genuine dispute of material fact or prove: (1) that he belongs to a protected class; (2) he was subject to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment affected a term, condition, or privilege of employment; (5) the employer knew or should have known of the harassment and failed to take prompt remedial action. *Hernandez*,

641 F.3d at 125 (citing *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)).  In *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and *Burlington Industries., Inc. v. Ellerth*, 524 U.S. 742 (1998), the Supreme Court modified this test with respect to cases in which the alleged harasser is a supervisor with immediate or higher authority over the harassed employee. *Celestine,* 266 F.3d at 353-54 (citation omitted).  In such cases, the employee need only meet the first four elements of the test. *See id.*

The fourth element of the test is met only if the harassment was "sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive working environment." *Id.*; *Hernandez,* 641 F.3d at 125 (citing *Ramsey*, 286 F.3d at 268).  If the conduct at issue was not severe or pervasive, the employer cannot be held vicariously liable for the supervisor's actions.  *Wyatt v. Hunt Plywood Co.*, 297 F.3d 405, 409 (5th Cir. 2002).  If, however, the conduct was severe or pervasive, the employer may avail itself of the *Ellerth/Faragher* affirmative defense in an attempt to avoid liability.  *Wyatt*, 297 F.3d at 409; *Pfeil v. Intecom Telecomms.*, 90 F. Supp. 2d 742, 749 (N.D. Tex. 2000).  This defense is comprised of two elements, both of which an employer must establish to avoid liability under Title VII: (1) the employer exercised reasonable care to prevent and correct promptly any racially harassing behavior; and (2) the plaintiff employee unreasonably failed to take advantage of any available preventive or corrective opportunities. *Ellerth*, 524 U.S. at 765; *Wyatt*, 297 F.3d at 409.

To be actionable, the work environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Hernandez*, 641 F.3d at 125 (citing *Faragher*, 524 U.S. at 787).  To determine whether an environment was objectively offensive, courts consider the totality of the

circumstances, including the frequency of the conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance. *WC&M*, 496 F.3d at 399; *Hernandez*, 641 F.3d at 125. "Workplace conduct is not measured in isolation." *Ramsey*, 286 F.3d at 268 (citing *Breeden*, 532 U.S. at 270). For a hostile working environment to be deemed sufficiently hostile, all of the circumstances must be taken into consideration. *Id.*

Even when a hostile environment is shown, the plaintiff must establish that the workplace environment had the effect of altering the terms, conditions, or privileges of his employment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Nash v. Electrospace Sys., Inc.*, 9 F.3d 401, 403 (5th Cir. 1993). "Not all harassment will affect a term, condition, or privilege of employment. The 'mere utterance of an . . . epithet which engenders offensive feelings in a[n] employee[ ] does not sufficiently affect the conditions of employment." *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir. 1999) (citation omitted). Title VII's overall goal of equality is not served if a claim can be maintained solely based on conduct that wounds or offends but does not hinder an employee's performance. *Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 194 (5th Cir. 1996).

Defendant argues that Plaintiff is unable to establish elements (3), (4), and (5) of his hostile work environment claim. Defendant does not dispute that Plaintiff is a member of a protected class or that Plaintiff suffered harassment. Accordingly, the court finds that Plaintiff has established elements (1) and (2) for summary judgment purposes. The court will review elements (3), (4), and (5) in turn.

### 1.   Whether the Harassment Complained of Was Based on Race

Defendant argues that Plaintiff has failed to create a genuine dispute of material fact that he was subjected to a racially hostile work environment. Def.'s Br. at 31.  In support, Defendant argues that Carter is unable to provide evidence that the alleged harassment he experienced was race-based, and that Plaintiff's deposition testimony reveals he bases his harassment claim on faulty assumptions and subjective beliefs.  Def.'s Br. at 32.  Plaintiff argues that Luminant fails to provide an appropriate context for many of the remarks made by Carter in his deposition testimony and that the court should look at Plaintiff's broader testimony.  Pl.'s Resp. Br. at 26. Harassment is based on race if "the complained-of conduct had a racial character or purpose." *Arrieta v. Yellow Transp., Inc.*, 2008 WL 5220569, at \*24.

Carter complains of conduct that occurred during his training at Luminant Academy. Plaintiff asserts that Instructor Mallory ignored his questions and lectured to and catered to only one side of the room.  Def.'s App. at 21.  Plaintiff asserts that certain attendees of Luminant Academy avoided him and showed resentment toward him and that when he attempted to communicate with them, they would turn their backs and scatter.   Def.'s App. at 21.  Plaintiff testified that Instructor Mallory catered to these attendees and hung out with these attendees. Def.'s App. at 21.  Plaintiff's testimony, however, reveals that he did not know how this conduct related to his race.  By process of elimination, Plaintiff reasoned: "Well, I don't think I smelled bad, I don't think I was— I communicated poorly . . ." Def.'s App. at 22.  Plaintiff also ruled out his age and religion.  *Id.*  Plaintiff admits there were Caucasian and Hispanic attendees on his side of the room, some of whom eventually got up and moved to the other side of the room to better observe the lecture.  Def.'s App. at 22-23.  Instructor Mallory's actions were not manifestly or inferentially race-based, and Plaintiff has not articulated how Mallory's actions

were race-based.  Accordingly, the court finds Plaintiff has adduced insufficient evidence to raise a fact dispute as to whether Mallory's conduct was race-based.

Plaintiff further testified that the attendees of Luminant Academy were required to pass a test with a certain grade percentage and that his test scores were altered because five or six of his test questions had two and three answers marked, and he is certain he did not mark multiple answers per question.  Def.'s App. at 23.  Plaintiff does not know who altered his test.  Def.'s App. at 23.  Plaintiff believes Instructor Mallory harbored prejudicial feelings.  Def.'s App. at 24.  Plaintiff testified that Instructor Mallory announced to everyone, "Well, everybody passed the test but one person, Anthony Carter."  Def.'s App. at 23.  Plaintiff's test was later corrected to reflect a passing grade.  Def.'s App. at 26.  Plaintiff testified that the instructors did not use any racial slurs or epithets and never verbalized any prejudice toward him.  Def.'s App. at 22, 25. It is possible that Plaintiff's test alteration was race-based; however, Plaintiff does not provide the court with sufficient information for it to make that inference.  Accordingly, the court finds this evidence is insufficient to raise a fact dispute as to whether this conduct was race-based.

Plaintiff testified that Instructor Foster would act upset, as if Plaintiff was interrupting him when Plaintiff asked questions, but would stop and elaborate when others asked questions. Def.'s App. at 25.  Carter believes or suspects Foster's conduct was race-based, and it may have been, but he does not provide the court sufficient evidence to make that inference.  Accordingly, the court finds this evidence is insufficient to raise a fact dispute as to whether Foster's conduct was race-based.

Plaintiff further testified that instructor Timmons stated, "Oh, by the way, there are people that are always a victim of this and a victim of that, and these people are so stupid that you need to put bleach in their gene pool."  Pl.'s App. at 263; Def.'s App. at 25.  Plaintiff

testified that Timmons stared directly at him the entire time he was making the comment. *Id.*

Plaintiff testified that "victim" was "code talk." Def.'s App. at 25. It is common knowledge that

bleach is used to clean or lighten, and as Timmons looked at Carter directly while making this

statement, it gives the court no pause to conclude that Instructor Timmons's "bleach" comment

was race-based.

Plaintiff asserts that after the 2008 elections, Supervisor Thomas made a comment

regarding the new Obama Administration to another coworker in Carter's presence: "I got two

shotguns. You take one. I'll take one. Let's go take our country back." Pl.'s App. at 264-65;

Def.'s App. at 37. When asked how that comment was racially-based, Plaintiff responded: "It

was during the elections." Def.'s App. at 37. When asked again how that comment was racially-

based, Plaintiff testified: "I don't remember. One would have to use their imagination. I don't

know ma'am." *Id.* Plaintiff asserted the statement was derogatory, but when asked how it was

derogatory, Plaintiff testified: "Well, inflammatory, for a supervisor at Luminant, it had nothing

to do with Luminant's business. It's like talking politics and— and religion." Def.'s App. 37.

Plaintiff explained that the context was that several of the employees were "talking about the

election and the fact that the Democrats had won, and [Thomas's "take our country back

comment"] was the response." Def.'s App. at 38. When asked again how that is racially based or

derogatory, Plaintiff shook his head and replied: "Well, that's my answer. I don't know." Def.'s

App. at 38.

Plaintiff's brief states that Thomas's comment can be translated: "get that ****[*]r out of

here." Pl.'s Resp. Br. at 27. The court refuses to draw this inference. This statement is

speculative and not supported by Carter's deposition testimony; it allows an impermissible

inference to be drawn from Carter's testimony. At no time did Carter mention race. Nothing in

the record supports the inference that Thomas made the statement because of President Obama's race.  While it is true that President Obama is African-American, it is equally true that a large segment of the country believes that his policies are too liberal and embrace socialism.  The deposition testimony supports the idea that Thomas wanted to take the country back from liberals or Democrats, and the testimony of Carter essentially concedes this.  Accordingly, the court concludes Plaintiff has not raised a fact question regarding whether Thomas's comment was race-based.

Carter asserts two comments were made that purportedly had slave implications.  First, when Carter began working on the crew for Supervisor Thomas, he told Carter that he had been reading a book, and when Carter inquired what it was about, Thomas said it was about a slave whose master helped him get a job.  Def.'s App. at 37; Pl.'s App. at 264.  Although Plaintiff never read the book, he testified that it was a popular cowboy book, and the book in question was not about a master-slave relationship.  Def.'s App. at 37.  Moreover, it is unlikely that the book in question was about a master helping a slave get a job, as a slave in America was bound in servitude to his master and was not permitted to seek outside employment.  Plaintiff has presented sufficient evidence from which a reasonable jury could find that Thomas's "off-the-wall" master-slave comment was intended to refer to Plaintiff and was race-based.

Second, Carter testified that on another occasion there was a group of employees in the production trailer, and at the end of a shift, crew members usually sweep and take up trash.  Def.'s App. at 44.  Plaintiff testified that there were only two brooms, and two other employees were using them.  *Id.*  Carter proceeded to take up chairs.  *Id.*  Coworker Freddy Montelongo asked Carter whether he would be on the same shift the next day, and then told Carter: "Well, if you're here tomorrow, you're gonna get two brooms."  Def's App. at 44; Pl.'s App. at 265.

Carter testified that he believed Montelongo was trying to make a spectacle out of him.  Def.'s App. at 44.  When asked how Montelongo's comment was racially derogatory, Plaintiff testified, "I didn't say that was racial[ly] derogatory.  I said that was hazing and harassment."  Def.'s App. at 44.  When asked: "Was it hazing and harassment based on your race?" Plaintiff replied, "could have been."  Def.'s App. at 45.  Plaintiff then testified the comment was racially motivated. Def.'s App. at 45.  Plaintiff also testified that he did not have any facts that the comment was racially motivated.  *Id.*  The court finds Plaintiff has not raised a fact dispute as to whether Montelongo's comment was race-based.  Though Montelongo referenced two brooms, there is no indication that such comment had any slave or race-based implications.  Frankly, in light of the context in which the statement was made, and the record before the court, the import of Montelongo's statement appears to be that Carter would receive double-duty for sweeping the next day, as he did not sweep on the day in question.

Plaintiff testified coworker Andrew Nelson was giving out keys to the new break room, and Nelson called over the radio and asked coworker Dennis McGee where he was and asked McGee if he had seen Carter.  McGee replied, "Oh, we hung him!" Pl.'s App. at 267; Def.'s App. at 46.  Defendant argues that McGee apologized to Plaintiff and explained that he made his comment in error and that McGee meant to refer to someone else.  *See* Def.'s App. at 47.  The court has previously determined that any reference to the terms "hang(ed)," "hung," "rope," "noose," or the like can reasonably be interpreted to refer to an African-American man being illegally put to death because of the history of illegally hanging black men after the Civil War, and well into the twentieth century, for the commission or alleged commission of a crime. Therefore, the court finds that Plaintiff has raised a fact dispute as to whether McGee's comment was race-based.

Plaintiff testified he saw a coworker, Russell Page, playing with a rope in the break room. Carter was called out to the plant on the radio but returned shortly thereafter to find Page gone and a hangman's noose hanging in the bathroom of the break room. Pl.'s App. at 271; Def.'s App. at 48. Defendant avers that that the summary judgment evidence disproves that Plaintiff discovered a noose at Oak Grove. Plaintiff's declaration states that he discovered the noose "[i]n or around September or October, 2009 . . .." Pl.'s App. at 271. Plaintiff's interrogatory answers indicate he discovered the noose "[i]n or around October 2009" while working on Crew 4. Def.'s App. at 196. Plaintiff's deposition testimony indicates that he does not remember the exact date, but he guesses he discovered the noose in 2009 the night he was working on Crew 4. Def.'s App. at 048. Luminant has produced evidence that Plaintiff never worked overtime with Crew 4 in October 2009.[27] Def.'s App. at 316. Plaintiff testified that he believes he spoke to Nona Johnson in Human Resources about the noose. Def.'s App. at 048. The court must view all facts and inferences in the light most favorable to the nonmoving party. Plaintiff's assertion that he discovered a noose is supported by competent summary judgment evidence. A noose can reasonably be interpreted to refer to an African-American man being illegally put to death. Accordingly, the court concludes that a reasonable jury could find that leaving or placing a noose in the workplace constitutes race-based harassment.

---

[27]Defendant objects to the inconsistent dates proffered by Plaintiff with respect to his alleged discovery of a noose. Def.'s Objections at 13. The court will not allow, without explanation, Plaintiff to change his sworn interrogatory response regarding the date on which the noose was allegedly discovered. Plaintiff's declaration provides no explanation for the change. The court has previously determined that a party may not defeat a motion for summary judgment using an affidavit (or declaration) that impeaches, without explanation, sworn testimony." *Copeland v. Wasserstein, Perella & Co., Inc.,* 278 F.3d 472, 482 n.21 (5th Cir. 2002) (citing *S.W.S. Erectors, Inc. v. Infax, Inc.,* 72 F.3d 489, 495 (5th Cir. 1996)). The court finds this requirement applies to sworn interrogatory responses. The court **sustains** Defendant's objection and will consider only that the noose was found in or around October 2009. The court, nevertheless, finds that "in or around October 2009" does not necessarily mean *within* the month of October 2009. Defendant's evidence that Plaintiff did not work overtime on Crew 4 does not conclusively prove that Plaintiff did not discover a noose. A jury could reasonably conclude that a noose discovered on November 1, 2009, or September 29, 2009, for example, was discovered "in or around October 2009."

Plaintiff testified that on one occasion he overheard a conversation between coworker Brian Arceneaux and Supervisor Darren Thomas, wherein Arceneux was speaking about Carter and saying, "This is how we dealt with them back home." Def.'s App. at 196. Carter testified that he did not hear the entire conversation, but he is "almost sure" that Arceneaux was referencing Black-Americans. Historically, "them" in this context is a phrase used by the majority to refer to persons of another race or ethnic group to avoid using the actual name of the race or ethnic group. Plaintiff testified that on another occasion Arceneaux and another coworker, Brian Barnett, were in the production trailer where Carter was situated, and they started talking and singing loudly that: "This is redneck country!" Pl.'s App. at 267; Def.'s App. at 56. In the past, "redneck" was a slang term used in reference to poor rural whites. More recently, the meaning has expanded to mean "bigoted" or "racist." When isolated from the context, Arceneaux's comments may appear nondiscriminatory or nonracist. The court, however, finds that the meaning of his words depends on various factors, including context, inflection, tone of voice, local custom, and historical usage. *See Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006). Given the historical usage of the statement, "This is how we dealt with them back home," and the new meaning that has been ascribed to the term "redneck," as well as the manner in which the coworkers were singing the song, the court determines a reasonable jury could infer that the comments (statement and song) were race-based.

Plaintiff obliquely references that his placement on Step One Discipline contributed to a hostile work environment. This conduct, however, does not constitute race-based harassment, as Plaintiff has not provided evidence or facts to support his assertion that his level of discipline was more severe than that imposed on white employees for similar conduct. Def.'s App. at 45-46, 64-65.

**Memorandum Opinion and Order – Page 51**

On another occasion, Plaintiff was in the control room with a Luminant employee and a Commissioning Agent from a company called Flour, and was about to participate in a walk-down of the drain systems.  Upon leaving the control room with the Flour agent and Luminant employee, Luminant Supervisor Mike Cockerham and four crew members met up with them.  According to Carter, Cockerham instructed him to go to the very back of the group.  Pl.'s App. at 264; Pl.'s Supp. App. at 60.  Plaintiff has not established that this incident constitutes race-based conduct.  Conduct in which the harasser does not refer to the victim's protected characteristic can be considered harassment based on the victim's protected characteristic.  *See EEOC v. WC&M Enters.*, 496 F.3d 393, 398-399 (5th Cir. 2007).  A court may draw such an inference when the harasser has exhibited a pattern of harassment based on the victim's protected characteristic.  *Id.*  Such is not the case here.  Plaintiff has not established that Cockerham had a pattern of race-based harassment.

Plaintiff also states that he reported an instance to Supervisor Mickey Woolsey in which he was walking back to the production trailer and was targeted by a red laser beam.  Pl.'s App. at 266.  Plaintiff does not know who targeted him with the red laser beam.  Pl.'s Supp. App. at 59.  The evidence adduced by Plaintiff only demonstrates that someone was "messing with him," *id.,* which means that someone was either teasing Plaintiff, or engaging in conduct to annoy, irritate, or possibly harm him.  In any event, there is no indication that the incident had anything to do with Plaintiff's protected characteristic.  Accordingly, this conduct does not constitute race-based harassment.

Finally, Carter asserts that Stan Williams, a contract worker for Flour, witnessed a number of hangman's nooses on the jobsite at Oak Grove during 2009.  Pl.'s App. at 275.  Williams allegedly observed Carter's white crew members in the break room talking about

Carter, and one of them stated: "We need to get that nigger out of here!"  Pl.'s App. at 275.  On another occasion, Williams purportedly heard a white coworker of Carter say over the radio regarding Carter, "We ought to hang that nigger!"  Pl.'s App. at 275.  Carter admits he did not hear these comments on the job site.   Pl.'s Resp. Br. at 28-29.  Carter also does not provide any evidence that he witnessed the hangman's nooses (other than the one he reported to Johnson) on the jobsite.   Carter asserts that the "Fifth Circuit and other courts have long recognized that racially degrading comments and actions can create or contribute to a hostile work environment even when they are not specifically directed at an individual plaintiff."  Pl.'s Resp. Br. at 29.  Carter, however, cites no authority that actions can contribute to a hostile work environment when a plaintiff was not aware of them.   Plaintiff does not assert that he became aware of the conduct allegedly witnessed by Williams during the course of his employment with Luminant.  The court has difficulty in holding that harassment that was not experienced, witnessed, or learned of by Carter until after his employment was terminated by Luminant can constitute harassment that affected "a term, condition, or privilege" of the his employment.   Accordingly, the court will not consider the conduct witnessed by Williams.[28]

### 2.   Whether the Harassment Affected a Term, Condition, or Privilege of Employment

Defendant contends that of all the conduct about which Plaintiff complains, only two alleged instances were arguably racially-tinged—  Plaintiff's coworker's comment over the radio that "we hung him" and Plaintiff's alleged discovery of a rope in the shape of a noose.  Def.'s Br. at 34.  With respect to these instances, Defendant asserts that the alleged harassment was neither severe nor pervasive enough to constitute a hostile work environment.   Def. Br. at 31, 34.

---

[28] With respect to any other alleged act of race-based harassment not specifically addressed by the court in section III(C)(1), the court determines that such alleged instances of harassment are not race-based, or such acts have been addressed in other parts of this opinion.

Plaintiff argues that when considering the totality of the evidence, a reasonable trier of fact could determine that racist sentiments and actions pervaded Carter's workplace, thereby creating a hostile work environment. Pl.'s Resp. Br. at 30. The court disagrees with Defendant's contention that only two incidents were arguably racially-tinged, as it concludes there were six incidents of conduct that can be classified as race-based harassment.

In light of these instances of conduct, the court concludes that the harassment experienced by Carter was not severe or pervasive enough to constitute a hostile work environment. The six instances of harassment experienced by Plaintiff occurred during a span of approximately eighteen months. Plaintiff states the discriminatory conduct began after he was hired as a full-time employee at Luminant's Oak Grove power plant, during his training at the Luminant Academy in early March 2008. Plaintiff discovered a noose at Oak Grove in October 2009 and was terminated in November 2009. Plaintiff presented evidence that he sought medical attention due to job-related stress, anxiety, and depression, which he contends was a result of race discrimination he experienced at work.[29] Pl.'s App. at 252-260. Plaintiff also presented evidence that he had discussions with management about taking leave under the Family Medical Leave Act ("FMLA") because of job-related anxiety issues.[30] Pl.'s App. at 44. Plaintiff also

---

[29]Federal Rule of Evidence 803(4) provides a hearsay exception for statements "made for purposes of medical diagnosis or treatment." It applies to statements "describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Fed. R. Evid. 803(4). The rule does not require that each statement be "necessary" for medical treatment; it requires that statements be reasonably pertinent to diagnosis or treatment. *United States v. Santos*, 589 F.3d 759, 763 (5th Cir. 2009). Plaintiff's medical records indicate treatment for anxiety and sleeplessness. The court finds that the general cause of Plaintiff's stress and/or anxiety was reasonably pertinent to his diagnosis or treatment. The court does not consider any specific instances of racial discrimination mentioned or recounted by Plaintiff in his medical records. Accordingly, the court **overrules** Defendant's objections to Plaintiff's Appendix at 252-260.

[30]Defendant objects to Exhibit 23 (Pl.'s App. at 44), attached as an excerpt from the Coffey Deposition pursuant to Federal Rules of Evidence 602, 801, 802, 901 on the bases that it is unauthenticated, lacks a proper foundation, and contains hearsay statements of Plaintiff. Exhibit 23 is a single page of handwritten notes regarding a meeting attended by Plaintiff, Rob Rodriguez, and David Cole. The court **overrules** Defendant's objections that Exhibit 23 is unauthenticated and lacks a proper foundation. The testimony of Dwayne Coffey provided by Plaintiff

established that he was discouraged from remaining on the job and requested a transfer to another jobsite because of the alleged harassment.  Pl.'s App. at 82; Def.'s App. at 48.

The court determines that Plaintiff's evidence demonstrates his work environment was subjectively offensive.  Plaintiff has not established, however, that his work environment was also objectively offensive.  For harassment to be sufficiently severe or pervasive to alter the conditions of the victim's employment, the conduct complained of must be both objectively and subjectively offensive.  *WC&M*, 496 F.3d at 399.  To determine whether the victim's work environment was objectively offensive, courts consider the totality of the circumstances, including: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or merely an offensive utterance; and (4) whether it interferes with an employee's work performance.  *Id.*  No single factor is determinative.  *Id.*

In *WC&M*, the EEOC asserted hostile work environment claims on behalf of an employee who was consistently ridiculed on the basis of his national origin.  The plaintiff, Mohommed Rafiq, was called "Taliban" by coworkers multiple times per day, even after repeated requests for his coworkers to stop.  *Id.* at 396.  Rafiq's manager also called him "Taliban" on four or five occasions.  *Id.*  Rafiq was also often referred to as "Arab," even though Rafiq told his coworkers on numerous occasions that he was from India.  *Id.* at 397.  Rafiq's coworkers mocked his religious dietary restrictions and prayer rituals.  *WC&M*, 496 F.3d at 397.  The court determined that the evidence showed Rafiq was subjected to verbal harassment on a

---

in his supplemental appendix provides evidence sufficient to support a finding that the evidence in question is what its proponent claims it to be.  Coffey testified that Exhibit 23 was the handwriting of David Cole and that the document was prepared by Cole for the benefit of Coffey.  Pl.'s Supp. App. at 13-14.  The court finds that the deposition testimony of Coffey, provided by Plaintiff in his supplemental appendix, establishes an adequate foundation.  The court also finds that Exhibit 23 is not hearsay, as it is an admission by a party-opponent within the meaning of Federal Rule of Evidence 801(d)(2).  In Exhibit 23, Cole explains that Plaintiff "believes the symptoms he is suffering are job-related . . . ."  This is not an out of court statement made by Plaintiff.  Rather, this is an out of court statement made by Cole regarding Plaintiff's beliefs.  The court will consider this statement and **overrules** Defendant's objection to the extent it applies to this statement.

regular basis for a period of approximately one year.  *Id.* at 400.  Moreover, the court found "Rafiq was sporadically subjected to additional incidents of harassment, such as his co-workers' comments on September 11, 2001, which suggested that he was somehow involved in the terrorist attacks against the United States; [a coworker's] statement that Rafiq should 'just go back where [he] came from;' and [a supervisor's] October 16, 2002 written warning, which stated that Rafiq was acting like a 'Muslim extremist.'"  *Id.*

In *WC&M*, the court emphasized that a regular pattern of frequent verbal ridicule or insults sustained over time can constitute severe or pervasive harassment sufficient to violate Title VII.  *Id.* at 400 (citing *Walker*, 214 F.3d at 626 (holding that African-American employees who were subjected to a variety of racial slurs over three-year period raised a fact issue as to whether slurs were sufficiently severe or pervasive to violate Title VII)).  In *Walker*, the plaintiffs had experienced or witnessed nearly twenty incidents of overt race-based harassment in a three-year period.  The court determined, that "while working for [the employer], the [plaintiffs/appellants] at various times were subjected to: comparisons to slaves and monkeys, derisive remarks regarding their African heritage, patently offensive remarks regarding the hair of African-Americans, and conversations in which a co-worker and supervisor used the word 'nigger.' The office manager also informed them that the vice-president did not want the African-American women to talk to each other."  *Walker*, 214 F.3d at 626.

The court finds that the conduct experienced by Plaintiff was comparatively infrequent. Plaintiff has not shown a *regular* pattern of frequent verbal ridicule or insults sustained over time.  The harassment experienced by Plaintiff is more akin to the sporadic incidents of harassment experienced by Rafiq in *WC&M*.  In *WC&M*, however, Rafiq experienced a regular pattern of insults and ridicule *in addition to* the sporadic incidents of harassment.  The

comments heard by Plaintiff were comparatively less severe than those experienced by the plaintiffs in *WC&M* and *Walker*.  The majority of the comments heard by Plaintiff did not consist of overt, racially derogatory comparisons or patently offensive insults as in *WC&M* and *Walker*.  By and large, the comments experienced by Plaintiff were covert, racially offensive utterances.

Plaintiff discovered a noose in the workplace; this isolated incident, however, was not severe or physically threatening or humiliating.  "The *frequent making of nooses*, coupled with the presence of allegedly offensive racial remarks and the presence of KKK graffiti at the worksite raise a fact issue regarding whether the work atmosphere . . . was racially hostile." *Bell v. Ingalls Shipbuilding, Inc.*, 207 F.3d 657, 2000 WL 122384, at *1 (5th Cir. 2000) (per curiam) (unpublished table decision) (reversing summary judgment in part) (emphasis added); *see also Wesley v. Yellow Transp.*, Inc., 2008 WL 294526, at *19 (N.D. Tex. Feb 04, 2008) (citing *Bell* and holding that there were genuine issues of material fact concerning whether the plaintiff's employment was affected in that the plaintiff adduced evidence of at least three instances in which he observed nooses displayed in the workplace in addition to evidence of Ku Klux Klan graffiti and the use of offensive racial remarks at the worksite); *but see Filer v. Donley*, 2011 WL 196169, at *7 (N.D. Tex. Jan. 20, 2011) (granting summary judgment against employee whose supervisor publicly displayed a noose in his office because no rational jury could find an abusive work environment when the plaintiff viewed the noose only once, for a matter of a few minutes, and the noose was not displayed in a manner that was physically threatening to plaintiff or any other African-American employees); *see also Jimerson v. Garrett Aviation Servs., LLC*, 2010 WL 5067692, at *1, 4-5 (S.D. Tex. Dec. 6, 2010) (holding that a rope in the shape of a noose hanging from the rafters at the plaintiff's workplace, that a coworker stated was to "wrap around

[the] [p]laintiff's neck," causing the plaintiff to fear for his life was insufficient to support a hostile work environment claim, as the incident was isolated and not accompanied by physical contact, the plaintiff did not flee or seek help, and the rope was a commonplace fixture in the workplace.)

With respect to the noose discovered by Plaintiff, the court notes he viewed the noose only once, and it was not displayed in such a manner that was physically threatening to Plaintiff. The noose was found in the bathroom of the break room; there is no evidence of any racially offensive graffiti, threatening displays or conduct, or references to Carter in connection with the noose.  Also, ropes were commonly used in the workplace for tag lines, air tuggers, and conveying tools from one elevation to the next.  Def.'s App. at 179-80.

The conduct experienced by Carter was not nearly as overt, severe, or egregious as the conduct experienced by the employees in *WC&M* and *Walker*.  Although Carter adduced evidence that his harassers' actions discouraged him from remaining on the job and caused him to experience stress and anxiety, interference with an employee's work performance, is only one factor to be considered.  *See WC&M*, 496 F.3d at 399 ("No single factor is determinative.  In short, a showing that the employee's job performance suffered is simply a factor to be considered.")

The court finds *Celestine* instructive and informative in determining whether the fourth element of a *prima facie* case has been met.  In *Celestine,* the court found that eight incidents of alleged racial harassment involving supervisory personnel over a two-year period was insufficient to constitute a hostile work environment, as none of the instances was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment.  *Celestine,* 266 F.3d at 354.  Carter has alleged six instances of racial harassment

**Memorandum Opinion and Order – Page 58**

over an eighteen month period.   Considering the totality of the circumstances,[31] the court similarly determines that Plaintiff has not established that the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment.   The court, in reaching this conclusion, does not minimize the indignities or offensive conduct that Carter endured; however, the conduct falls far short of that required to establish a racially hostile work environment.   As Plaintiff has failed to raise a genuine dispute of material fact with respect to element (4) of a *prima facie* case, he necessarily fails to establish his claim of harassment based on a racially hostile or abusive work environment.   Because element (4) fails, the court need not address element (5).   Accordingly, Defendant is entitled to judgment as a matter of law on Plaintiff's hostile work environment claim.

### D.  Miscellany

Defendant Luminant moves, in the alternative, for partial summary judgment on Carter's claims for back pay, reinstatement, and front pay based on the "after-acquired evidence" doctrine.   Defendant also raises the "same-actor inference" regarding Carter's termination with respect to Carter's discrimination claims.   The court has legal and factual questions regarding both of these doctrines, as neither is fully-developed.   Accordingly, the court **declines** to grant summary judgment on the "after-acquired evidence" doctrine. The court will dismiss Plaintiff's

---

[31]Plaintiff urges the court to consider demographic information, such as the percentage of African Americans living in Robertson County, Texas— the county in which Oak Grove plant is located— compared to the number of African Americans working at Oak Grove plant.   The court finds it relevant that Carter was the only black person on his crew and one of two black persons of approximately one hundred fifty workers at the plant site while employed at Luminant.   The court must consider the social context of the plaintiff's work environment and what a reasonable person in Plaintiff's position would consider hostile. *See Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81-82 (1998) (comparing physical contact acceptable between a professional football player and his coach and contact acceptable between a coach and his secretary).   The court, however, believes consideration of the county demographics stretches the requirement of considering the social context of the plaintiff's work environment too far.   Accordingly, the court will not consider the county demographics proffered by Plaintiff.

discrimination claims on other grounds and thus finds it unnecessary to rule on the applicability of the "same-actor inference."

## IV. Defendant's Objections to Plaintiff's Evidence

Luminant filed Defendant's Objections to Plaintiff's Evidence Offered in Support of Plaintiff's Response to Defendant's Motion of Summary Judgment on September 20, 2011. The court reviewed the objections, response, reply, and supplemental appendices and ruled on the objections as the evidence was presented in the summary judgment briefing. To the extent the court has not explicitly ruled on Luminant's objections, the court **overrules** such objections as moot, as it has only considered evidence that is admissible pursuant to Rule 56 of the Federal Rules of Civil Procedure and the summary judgment standard herein enunciated.

## V. Conclusion

For the reasons herein stated, the court **determines** that no genuine disputes of material fact exist as to Plaintiff's claims of discrimination; Plaintiff's claims of retaliation, except claims (5) and (6); and Plaintiff's claims of a racially hostile work environment. Therefore, Defendant is entitled to judgment as a matter of law on all of these claims, except claims (5) and (6) for retaliation, and they are **dismissed with prejudice**. Genuine disputes of material fact exist with respect to claims (5) and (6) for retaliation, and these claims remain for resolution by trial or other means. Accordingly, the court **grants in part and denies in part** Defendant Luminant Power Services Company's Motion for Summary Judgment to the extent herein stated. The court **denies** Defendant's Motion for Partial Summary Judgment on its Affirmative Defense of After-Acquired Evidence.

The court's ruling substantially reduces the scope of this action, as only two retaliation claims remain out of the numerous claims asserted by Carter. As evidenced by the length of this

opinion, this case has been overlitigated, which has unnecessarily consumed scarce judicial resources.  In light of the current posture of the case, the court strongly believes that the parties should consider resolving this action without the necessity of a trial.  The court therefore **directs** the parties to inform it in writing by **December 9, 2011,** whether they are amendable to having this action mediated by United States Magistrate Judge Paul D. Stickney.

**It is so ordered** this 6th day of December, 2011.


Sam A. Lindsay
United States District Judge